**Bobby Ray ROGERS, Appellant,**

v.

**The STATE of Texas.**

**No. 1412–01.**

Court of Criminal Appeals of Texas.

May 21, 2003.

John H. Hagler, Dallas, for appellant.

Lisa Braxton Smith, Assistant District Attorney, Dallas, Matthew Paul, State's Attorney, Austin, for State.

## *OPINION*

COCHRAN, J., delivered the unanimous opinion of the Court.

A jury convicted Bobby Ray Rogers of murdering his estranged wife and sentenced him to life in prison. On appeal, the court of appeals reversed appellant's conviction and remanded his case for a new trial.[1] We granted the State's petition for discretionary review to determine: 1) whether the court of appeals correctly held that appellant's trial request for an "accident instruction" was equivalent to a request for a jury instruction on "voluntary conduct"; and if so, 2) whether the court of appeals was then correct to apply the *Almanza*[2] "some harm" standard of review.[3]

We find that: 1) the defensive theories contemplated by the terms "accident" and "involuntary act" are not the same; 2) the trial judge could not be expected to divine that counsel actually wanted an instruction on voluntary conduct when he requested an "accident instruction;" and, therefore, 3) the court of appeals incorrectly applied the *Almanza* "some harm" standard of review. Accordingly, we reverse the court of appeals and remand the case for further proceedings.

### I.

Appellant and his estranged wife, Debra Rogers, had a rocky relationship. Approximately a year before Debra's death, the couple separated, and appellant stayed with his sister, while Debra moved in with her mother. Although they were living apart, appellant and his wife continued to see each other regularly. They often argued when they were together. Appellant testified and admitted that he shot his wife, but stated that the shooting was "an accident" that happened during a struggle over the gun.

Appellant testified that Debra called him that afternoon, saying that she was depressed and wanted to talk to him. Debra picked appellant up, they stopped to buy beer and a few groceries, and they ended up at Debra's mother's house around 3 p.m. Appellant made dinner for the three of them. Afterwards, appellant and Debra went to her room to watch television. Debra watched from her bed, while appellant lay on a pallet on the floor.

The couple began to argue over appellant's relationship with his first wife. Debra accused him of renewing that relationship, which appellant denied. Appellant testified that he asked Debra to take him home and he went outside, but Debra did not follow. After smoking a cigarette, Appellant returned to the bedroom where Debra was still sitting on her bed. Appellant lay down again on the pallet and they both fell asleep for a little while.

After they woke up, they began to argue again. According to appellant, Debra reached under the foot of the bed for her gun, saying that she "was going to pop"

---

**1.** *Rogers v. State,* No. 05–00–00726–CR, 2001 WL 579924 (Tex.App.-Dallas May 31, 2001) (not designated for publication).

**2.** *Almanza v. State,* 686 S.W.2d 157 (Tex. Crim.App.1984).

**3.** This Court granted review on the following grounds:
1. Did the court of appeals err in holding that a request for an accident instruc-

tion is equivalent to a request for a voluntary conduct instruction?
2. Was the court of appeals incorrect in applying the *Almanza* "some harm" standard of review where the jury instruction requested at trial varied from the jury instruction the court of appeals held was erroneously omitted from the jury charge?

him. Appellant stated that Debra "reached for the gun and I reached for it and got it and she grabbed my arm and it went off." When asked by defense counsel:

Q. Did you mean to kill [your wife]?

A. No. I—I mean if I did, I would be man enough to tell.

Q. Did you mean to pull the trigger?

A. I didn't mean to pull the trigger. It was just, you know, after she reached[,] hit my arm and I was already getting up from the bed, it went off.

Q. You got the gun and you were getting up. You were getting up from the pallet?

A. And it went off.

Q. Did she—she hit your arm?

A. Yes. She was grabbing my arm like that.[4]

The prosecutor then cross-examined appellant:

Q. You grabbed the gun?

A. After she bent over for it, yes.

Q. How did you grab the gun?

A. I just picked it up normal, just like that.

Q. Did you put your hand on that trigger?

A. It was on the trigger.

Q. Did you use both hands?

A. I didn't use both hands, I don't think.

4. Before the prosecutor began her cross-examination of appellant, the trial court ruled, outside the jury's hearing:

the Court will allow the State to ask the defendant about the aggravated assault conviction in 1984 *to rebut the defensive theory of self-defense and to rebut the defensive theory of accident.* The Court will allow the State to go into the facts of that conviction based upon the representations that the State has made as to what those facts are, that the complainant in that case was the defendant's first wife and the similarity of that offense to this offense even though the Court has been apprised that the weapon was a knife and not a gun. (emphasis added).

Appellant then testified to that incident, admitting that he had gone to his first wife's home, kicked in the door, "got into a fight with her," grabbed a steak knife from the living room table, stabbed her wife in the shoulder and right hand, and then broke a bottle over her head. He was sentenced to three years in prison for this aggravated assault.

The fact that appellant had assaulted and stabbed his first wife during "a fight" in the same manner that the State alleged appellant shot his second wife during "a fight" was probative of his assaultive intent to harm Debra and tended to disprove his contention that the charged offense was the result of an unintentional shooting. It would not be proba-

tive, however, to prove the commission of a "voluntary" act in this case unless appellant asserted that, in the prior case, as well as the present one, it was his wife who had "bumped," "grabbed," or otherwise performed the act that lead to her own injury. The trial judge admitted this evidence to demonstrate appellant's mental intent, rather than the commission of a voluntary act. Appellant certainly never objected or argued that the extraneous offense was inadmissible because he was claiming an "involuntary act" rather than an unintentional shooting.

As noted by Texas commentators, "the admission of such [extraneous offense] evidence may be justified as showing the absence of mistake or accident, [but] it is, in fact, being used to prove that the defendant acted with the state of mind required by the offense of which she is accused." STEVEN GOODE, OLIN GUY WELLBORN III, M. MICHAEL SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL, § 404.6.3, at 173–74 (Tex.Prac. 2d ed. 1993). *See, e.g., Johnson v. State* 963 S.W.2d 140, 144 (Tex.App.-Texarkana 1998, pet. ref'd) (upholding admission of extraneous offense committed by aggravated assault defendant; "[w]hen the accused claims self-defense or accident, the State, in order to show the accused's intent, may introduce evidence of other violent acts where the defendant was an aggressor"); *Robinson v. State,* 844 S.W.2d 925, 929 (Tex.App.-Houston [1st Dist.] 1992, no pet.) (same).

Q. But you sure got hold [*sic*] of that gun?

A. Yes. I was trying to get it to keep her from getting it.

Q. Why—at that point when you have that gun in your hand why didn't you just bring your arm down just like this and turn and walk around?

A. When I was coming up with the gun like that she hit my wrist. I was like—she was grabbing my wrist.

Q. Sir, did you cock that gun?

A. No, I didn't.

Q. You didn't cock the gun?

A. No.

Q. You actually had to make an effort and pull that trigger; is that right? [5]

A. It seemed like when she grabbed my wrist, yes, to keep her getting it.

Q. How did she grab your wrist?

A. Did like that, gun went off. . . .

Q. Let me back up a little bit, sir. She was sitting up?

A. She was.

Q. She grabbed your arm?

A. She hit my arm as I was coming out from under the bed with the gun. I didn't know how I had the gun. I was just trying to get it and it went off.

After seeing that Debra had been shot in the forehead, appellant called 911 to say that "someone had been shot," then he put the gun in his pocket and drove off in Debra's car. He soon stopped, went up to a neighbor's house and told them "I just shot my wife." He then went to another friend's house, told him he had shot his wife, wanted to leave town, and asked the friend to hide Debra's gun for him. When the friend refused to hide the gun, appellant dumped it in the trash behind the friend's mobile home. Appellant then drove 150 miles to his brother's home and told his brother that he had shot Debra. He did not tell any of these people that the shooting was "an accident."

In rebuttal, the State called Deputy David Utsey, to whom appellant had later surrendered himself in Freestone County and to whom he had given a written statement. That statement included the following:

On February—on Friday, June 18th, 1999, [Debra] called me at our house at 3121 Palo Alto. She was crying, saying she was depressed. She come over and picked me up and then we went back to her mother's place.

After talking with her she cheered up. She laid down and took a nap. One of her friends come by to see her. The friend looked in on her and she was still asleep. I took her friend Teresa home.

When I got back my wife was on the porch of her mother's house. She looked angry and tired. She asked me to go get a beer. I went and got a beer and came back. I fixed her and her mother something to eat. She started fussing and arguing that I was sleeping with my ex-wife Mary Ann Robinson.

One thing led to another. I asked her to take me home. She said she was full.

5. Firearms examiner Travis Spinder had earlier testified that he conducted a "trigger pull force" test on Debra's revolver. He explained that trigger pull force refers to the force required to pull the trigger, release it, and fire a cartridge. He stated that it would take four-and-a-half pounds of force to fire the revolver in single action mode (*i.e.,* if the hammer were already cocked), but that it would take fourteen-and-a-half to sixteen pounds to fire the revolver in double action mode (*i.e.,* if the hammer were not already cocked). Spinder agreed that if someone picked up that .22 caliber revolver and the hammer was not cocked, it would take at least fourteen and a half to sixteen pounds of force to fire it.

I know that she had been drinking a good bit. She told me that she was going to pop me. By this I knew that she was going to shoot me. She has pulled a gun several times in the past.

She was on her way to the bedroom. I knew that she had it in there because she was walking fast. I went into the bedroom and found her reaching under the bed. She pulled a pistol out from under the bed and I grabbed it from her. As soon as I got the gun, I shot her. She fell on the bed.

Immediately after Deputy Utsey's testimony, both sides rested, and the trial judge asked defense counsel whether she had any objections to the charge. Defense counsel replied:

> COUNSEL: We have no objection. We will ask for an instruction on accident and we will ask for reasonable doubt on the extraneous offenses.
>
> THE COURT: Your request for a charge on accident is denied. Your request for a charge regarding the definition of reasonable doubt is denied due to the fact that the instructions go to the convictions of the defendant and not the extraneous offenses per se.
>
> COUNSEL: Thank you, Your Honor.

On appeal, appellant contended that the trial court erred in denying his request for a jury instruction on "the defense of voluntariness or accident." In a parenthetical, counsel argued that

> [a]lthough the defense attorney used the word 'accident,' as opposed to 'voluntariness,' it is readily apparent that the trial

court was aware of the objection voiced to the charge. In this context, 'voluntary' is essentially the antonym of 'accident.' "

The court of appeals stated that:

> While the defense of accident is no longer present in the penal code, the Court of Criminal Appeals has long held that homicide that is not the result of voluntary conduct is not to be criminally punished. The defense of "accident" is encompassed within the penal code's general culpability requirements.... A defendant is entitled to a charge on the voluntariness of his acts when warranted by the evidence, whether the evidence is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that the testimony is not entitled to belief. The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge. To be entitled to the charge, there must be evidence of an independent event such as the conduct of a third party that could have precipitated the incident.[6]

The court of appeals then concluded that appellant's testimony "raise[d] the issue of whether appellant voluntarily shot Debra or whether Debra's own conduct precipitated the incident" and that the trial court erred in not giving the requested jury instruction.[7] Finding that appellant had timely objected to the charge error, the court of appeals then conducted a harm analysis under *Almanza*'s "some harm" standard:[8]

---

6. *Rogers v. State*, No. 05–00–00726–CR, slip op. at 4–5, 2001 WL 579924 (Tex.App.-Dallas May 31, 2001) (not designated for publication).

7. *Id.* at 4–5. We note that the court of appeals did not address whether the term "accident" is the equivalent of the term "involuntary." It appears that the court of appeals

believed that the two terms mean the same thing.

8. *Id. See Almanza*, 686 S.W.2d at 171 (reversal required when defendant timely objects to jury charge error and the error is "calculated to injure [his] rights").

Here, if the jury had been charged on the issue of voluntariness and found appellant did not shoot his wife voluntarily, he would have been entitled to acquittal. Thus, we conclude the charge error in this case resulted in some harm to appellant.[9]

Using this standard, the court of appeals sustained appellant's point of error, reversed his murder conviction, and remanded the case for a new trial.

## II.

The State's argument in this Court breaks down into multiple parts:

1) The court of appeals erroneously equated appellant's request for an "accident" instruction with a request for a "voluntary act" instruction;

2) Appellant's request for an "accident" instruction, without more, was insufficient to alert the trial judge that appellant actually wanted an instruction on "voluntary act";

3) Therefore, his request did not preserve the alleged error for review;

4) Even if the trial judge subjectively understood that appellant wanted an instruction on voluntary conduct, he did not err by refusing the request because the evidence at trial did not raise that issue;[10] and

5) Even if the court of appeals correctly found that there was error in the jury charge, appellant's failure to object means that the proper standard for harm analysis was not "some harm," but whether appellant suffered "egregious harm."

We consider the State's contentions in that order.

**A. A request for an "accident" instruction is not the equivalent of a request for an instruction concerning "a voluntary act."**

■ The first issue, whether the absence of any voluntary conduct and the claim of "accident" are interchangeable, arises from a 1975 change in the Texas Penal Code. The former penal code provided for a "defense of accident,"[11] which was properly applied in cases in which the defendant alleged that his act was not "intentional."[12] In *Williams v. State*, this Court explained that, regarding this former defense,

It must be recognized that the term "intentional" had a much different meaning in the law of accident under the former penal code than it now has in the law of culpable mental states under the present penal code. In the former law of accident, the term "intentional" meant something like "voluntary." Therefore,

---

**9.** The court of appeals' language here is ambiguous. The phrase "found appellant did not shoot his wife voluntarily," implies that the court of appeals was itself using the term "voluntarily" to mean "without a culpable intent." If Section 6.01(a) is the issue, the jury would have to find that "appellant did not commit any voluntary act to pull the trigger on the gun."

**10.** The State's first ground for review read:

Did the Court of Appeals err in holding that appellant was entitled to a jury instruction on voluntary conduct despite the absence of evidence of involuntary conduct?

We did not grant this ground for review; thus we express no opinion on its merits.

**11.** Former article 39 stated that:

No act done by accident is an offense, except in certain cases specifically provided for where there has been a degree of carelessness or negligence which the law regards as criminal.

TEX. PENAL CODE art. 39 (Vernon's 1925). The Legislature repealed this article when it enacted the present penal code. 1973 Tex. Gen. L. ch. 339, sec. 3.

**12.** *Williams v. State,* 630 S.W.2d 640, 644 (Tex.Crim.App.1982).

the correct meaning of the former term "accident" was that the actor did not voluntarily engage in conduct. But, "accident" was also used under the former penal code to describe a hodgepodge of defenses, including the absence of a culpable mental state, conduct which was voluntary but that differed from the intended conduct, mistake of fact, and an unexpected result. It is understandable that the drafters of the present penal code rejected a term which had so many meanings in law, as well as in popular usage, that it served to confuse issues rather than to clarify them.[13]

Thus, under the former penal code, "intentional" could refer to either the conscious physical commission of the bad act (the *actus reus*) or the mental state (the *mens rea*) with which the defendant committed that act. Conduct could therefore be described as "accidental" when the defendant claimed not to have committed any voluntary act which resulted in the harm,[14] or when the defendant performed volitional acts, but argued that he acted without intent to cause the harm or result.[15]

Under the current penal code, however, there is no "defense of accident."[16] Now, the no-voluntary-conduct aspect of that former defense is addressed by Penal Code Section 6.01(a), which provides that "a person commits an offense only if he voluntarily engages in conduct."[17] Section 6.02(a), in turn, addresses the claim that the defendant lacked the required mental state.[18]

In *Williams*, this Court expressly recommended that practitioners not use the term "accident":

> There is no law and defense of accident in the present penal code, and the bench and bar would be well advised to avoid the term "accident" in connection with offenses defined by the present penal code.[19]

Our present Section 6.01(a) was modeled after the corresponding Model Penal Code provision[20] and its commentary distin-

---

**13.** *Id.* (citations omitted).

**14.** Examples of non-volitional acts are listed in Model Penal Code § 2.01 (Requirement of Voluntary Act; Omission as Basis of Liability; Possession as an Act). They include, for example, "a reflex or convulsion," "a bodily movement during unconsciousness or sleep," "conduct during hypnosis or resulting from hypnotic suggestion," or "a bodily movement that otherwise is not a product of the effort or determination of the actor, either conscious or habitual." *Id.* § 2.01(2)(a)-(d).

As the Model Penal Code comments explain:

> the law cannot hope to deter involuntary movement.... People whose involuntary movements threaten harm to others may present a public health or safety problem, calling for therapy or even custodial commitment; they do not present a problem of correction.

*Id.* at 214–15.

**15.** *See, e.g., Becks v. State,* 158 Tex.Crim. 204, 207, 254 S.W.2d 396, 398 (1953) ("[m]urder is the voluntary or intentional killing of a person without justification or excuse ... The word 'voluntarily' carries with it the 'intention' to commit the offense charged").

**16.** *Williams,* 630 S.W.2d at 644.

**17.** Tex. Penal Code § 6.01(a) provides:

> A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession.

**18.** Tex. Penal Code § 6.02(a) provides:

> [A] person does not commit an offense unless he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct as the definition of the offense requires.

**19.** *Williams,* 630 S.W.2d at 644.

**20.** *See Alfred E. Brown v. State,* 955 S.W.2d 276, 284 (Tex.Crim.App.1997) ("*A.E. Brown*") (Price, J., joined by McCormick, P.J., Keller & Mansfield, JJ., dissenting).

guishes "voluntary" conduct from "accidental or unintended" results. Voluntary conduct "focuses upon conduct that is within the control of the actor. There is sufficient difference between ordinary, human activity and a reflex or a convulsion to make it desirable that they be distinguished for purposes of criminal responsibility by a term like 'voluntary.'"[21] Thus, before criminal responsibility may be imposed, the actor's conduct must "include[ ] either a voluntary act or an omission when the defendant was capable of action."[22] The operative word under Section 6.01(a), for present purposes, is "include." Both the Model Penal Code comments and the Practice Commentary to the 1974 Texas Penal Code stress that the "voluntary act" requirement does not necessarily go to the ultimate act (*e.g.*, pulling the trigger), but only that criminal responsibility for the harm must "include an act" that is voluntary (*e.g.*, pulling the gun, pointing the gun, or cocking the hammer).[23]

■■■ This Court has repeatedly discussed the meaning of "accident" and "voluntary conduct" to distinguish the two defensive theories.[24] For example, in *Adanandus v. State*, we stated that:

"conduct [is not] rendered involuntary merely because an accused does not intend the result of his conduct." Therefore, the issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state.... The fact that appellant did not initially intend to engage in a struggle with a customer does not render his conduct in doing so involuntary or any of his bodily movements during that encounter involuntary.... Even if, as appellant contend, the gun "went off" as he was stumbling backwards, there is no evidence that the gun fired on its own volition.[25]

"Voluntariness," within the meaning of Section 6.01(a), refers only to one's own physical body movements.[26] If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis or other nonvolitional impetus, that movement is not voluntary.[27] The word "accident," however, is a word of many meanings which covers a wide spectrum of possibilities. It generally means "a happening that is not expected, foreseen, or intended."[28] Its synonyms in-

---

**21.** Model Penal Code § 2.01, comment at 215.

**22.** *Id.* at 216.

**23.** *Id.* at 217.

**24.** *See A.E. Brown*, 955 S.W.2d at 280; *McFarland v. State*, 928 S.W.2d 482, 513 (Tex.Crim.App.1996); *Alford v. State*, 866 S.W.2d 619, 624 (Tex.Crim.App.1993); *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex.Crim.App. 1993).

**25.** 866 S.W.2d at 230 (citations omitted).

**26.** *See Rashann Maurice Brown v. State*, 89 S.W.3d 630, 633 (Tex.Crim.App.2002) ("the issue of the voluntariness of one's conduct, or

bodily movements, is separate from the issue of one's mental state").

**27.** *See* Tex. Penal Code § 6.01, Practice Commentary (stating that 1970 proposed code contained a definition of voluntary act to "exclude from criminal responsibility involuntary and unconscious action such as convulsion, reflex, and coma," and noting that this definition—"a bodily movement performed consciously as a result of effort or determination"—was deleted from enacted code, but concluding that "the willed act requirement remains, probably as an element of due process").

**28.** Webster's New World Dictionary 8 (2d college ed. 1996).

clude "chance, mishap, mischance, and misfortune."[29] It includes, but certainly is not limited to, unintended bodily movements. But at least since this Court's decision in *Williams*, the word "accident" has *not* been used to refer to an "involuntary act" under Section 6.01(a).

■ Thus, for purposes of section 6.01(a), an "accident" is not the same as, and should not be treated as the equivalent of, the absence of any voluntary act.[30] The court of appeals apparently accepted, at face value, appellant's contention that a claim of "accident" and a claim of no voluntary conduct are the same.[31] We again reject this view and hold that the word "voluntary" does not refer to the same defensive theory as the word "accident" and that therefore, the court of appeals erred when it implicitly equated the two.

**B. Appellant's request for an "accident" instruction was insufficient to**

**alert the trial judge that he wanted an instruction on "voluntary act."**

■ We agree with the State's second contention, that even if appellant subjectively intended to ask for an instruction on voluntary conduct, the mere request for an instruction on "accident," without more, was not sufficient to alert the trial judge that he wanted an instruction on voluntary conduct.[32] In the context of all the evidence at trial, we find that appellant's request was fatally ambiguous.

■ A defendant is entitled, upon a timely request, to an instruction on any defensive issue raised by the evidence, provided that: 1) the defendant timely requests an instruction on that specific theory; and 2) the evidence raises that issue.[33] To preserve possible error for appellate review, the defendant must sufficiently

29. ROGET'S II: THE NEW THESAURUS 11 (3d ed. 1995).

30. *See A.E. Brown v. State*, 955 S.W.2d at 280; *McFarland v. State*, 928 S.W.2d at 513; *Alford v. State*, 866 S.W.2d at 624; *Adanandus v. State*, 866 S.W.2d at 230. As Professor Kadish explains, "When a person claims the involuntary-act defense he is conceding that his own body made the motion but denies responsibility for it." Sanford H. Kadish, *Excusing Crime*, 75 Cal. L.Rev. 257, 259 (1987). As one commentator observes,

Professor Kadish's point can be seen if one considers the difference in meaning of the following two sentences: (1) "I raised my arm;" and (2) "My arm came up." Both statements suggest that a bodily movement has occurred. Yet, the difference in language expresses our intuitive understanding of the difference between a voluntary act (as described in the first sentence) and an involuntary one (the second sentence).

JOSHUA DRESSLER, UNDERSTANDING CRIMINAL LAW § 9.02[C] at 72 (2d ed.1995). In the first, the actor consciously performed a volitional act. In the second, the actor performed no conscious or volitional conduct-the arm may have "come up" because someone else moved it; it jerked upward as a reflex reaction when

someone hit the elbow; the actor moved his arm while asleep or unconscious; or, more esoterically, the arm moved as a result of hypnotic suggestion or some other non-conscious, non-volitional physical impetus.

31. This is not the first time in which courts have confused these disparate concepts. *See George v. State*, 681 S.W.2d 43, 43 (Tex.Crim. App.1984). Summarizing the court of appeals' disposition of that case, Judge Clinton observed that the court of appeals:

found there was evidence to support a requested instruction on what appellant call[ed] the "defensive theory of accident," but was transformed in the court below into a "defense of involuntary conduct."

*Id.* There, as here, the apple of an "accident" is not the orange of "involuntary conduct."

32. We assume, for the sake of argument, that appellant subjectively intended, as he now claims, to ask for an instruction on voluntary conduct under Section 6.01(a).

33. *Mendoza v. State*, 88 S.W.3d 236, 239 (Tex. Crim.App.2002); *Granger v. State*, 3 S.W.3d 36, 38 (Tex.Crim.App.1999); *Hamel v. State*, 916 S.W.2d 491, 493 (Tex.Crim.App.1996).

identify the defensive theory for which he seeks an instruction.[34] But a request for an instruction on "accident" is no request at all.[35] As discussed above, there is no longer any such defensive "accident" theory which requires a jury instruction. Here, not only did appellant fail to articulate exactly what he wanted, but when the trial court denied his "accident" request, he did not explain, object or otherwise clarify his request.

It is not at all evident from the record that the trial judge understood that appellant really wanted an instruction on voluntary conduct. In fact, the record suggests that the trial judge reasonably assumed that appellant wanted an instruction on the lack of the required intent. Immediately before the State began its cross examination of appellant, the trial judge ruled that the State could offer extraneous offense evidence "to rebut the defensive theory of self-defense and to rebut the defensive theory of accident" (*i.e.,* lack of intent to harm). Moreover, the evidence at trial was not such that it necessarily would have put the trial judge on notice that appellant wanted an instruction on voluntary con-

duct. A statement that a defendant did not intend to pull the trigger "cannot be plucked out of the record and examined in a vacuum."[36] If appellant wanted jury instructions on what are generally inconsistent defensive theories,[37] then it was incumbent upon him to tell the trial court exactly he wanted.

■ A defendant's testimony alone may be sufficient to raise a defensive theory,[38] but appellant's testimony did not unambiguously develop the theory that he was the passive instrument of another's act, *i.e.,* that, somehow, his finger had been made to exert the requisite fourteen-and-a-half to sixteen pounds of force to squeeze the trigger and fire the gun.[39] Given the fatal ambiguity of appellant's request for an "accident" instruction and absent any attempt by counsel to clarify the issue for the trial judge, we cannot find that the trial judge erred in denying appellant's request.

■ Because we find that appellant did not request any jury charge instruction on "voluntary conduct" under Penal Code Section 6.01, the court of appeals erred in

**34.** The request for a particular instruction need not be perfect. *Williams v. State,* 630 S.W.2d 640, 643 (Tex.Crim.App.1982) ("Although a specially requested charge may be defective, it still may serve to call the court's attention to the need to charge on a defensive issue"); *Austin v. State,* 541 S.W.2d 162, 166 (Tex.Crim.App.1976). However, the request must be adequate to give the trial judge, in the midst of trial, a clear understanding of the particular subject of the instruction.

**35.** Numerous courts of appeals have held that a request for an instruction on "accident" is not a request for an instruction on "voluntary conduct." *See, e.g., Kimbrough v. State,* 959 S.W.2d 634, 639 (Tex.App.-Houston [1st Dist.] 1995, pet. ref'd); *Molitor v. State,* 827 S.W.2d 512, 522 (Tex.App.-Austin 1992), *pet. dism'd,* 862 S.W.2d 615 (Tex.Crim.App.1993); *Harvey v. State,* 821 S.W.2d 389, 390–91 (Tex.App.-Houston [14th Dist.] 1991, pet. ref'd); *Rich-*

*ardson v. State,* 816 S.W.2d 849, 851 (Tex. App.-Fort Worth 1991, no pet.); *Graf v. State,* 807 S.W.2d 762, 767 (Tex.App.-Waco 1990, pet. ref'd).

**36.** *See Godsey v. State,* 719 S.W.2d 578, 584 (Tex.Crim.App.1986).

**37.** The assertion that one acted in self-defense (*i.e.,* "I intentionally and knowingly caused the victim's death because he was about to use deadly force on me") is generally inconsistent with an assertion that one did not act voluntarily (*i.e.,* "I did not consciously perform any act that led to the victim's death").

**38.** *Williams,* 630 S.W.2d at 643; *Warren v. State,* 565 S.W.2d 931, 933–34 (Tex.Crim.App. 1978).

**39.** *See* note 5 *supra.*

applying the Almanza "some harm" standard of review. We therefore reverse the court of appeals and remand the case for further proceedings consistent with this opinion.