**Opinion issued July 30, 2015**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

### NO. 01-14-00522-CR

———————————

### JAMES ALLEN BUNDAGE, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 12th District Court**
**Grimes County, Texas**
**Trial Court Case No. 17,304**

---

### O P I N I O N

A jury convicted appellant, James Allen Bundage, of the first-degree felony

offense of murder, and the trial court assessed punishment at thirty-five years'

confinement.[1]  In two issues, appellant contends that (1) the trial court erred in refusing to submit a jury instruction in the written charge on the defensive issue of whether he committed a voluntary act and (2) the trial court erred in denying his three *Batson* challenges made when the State used three preemptory strikes against African-American veniremembers.

We affirm.

## Background

Appellant and his neighbor Pat McHale, the complainant, had had an acrimonious relationship ever since appellant moved next door to McHale in 2004. McHale operated a dog training facility on his property, and this business—and the noise that it generated—had been the subject of numerous complaints filed by appellant with various authorities, including the Department of Housing and Urban Development.  McHale and his wife, Michelle, on their part, had called the Grimes County Sheriff's Department ("GCSD") on several occasions over the years to report appellant's threatening behavior.  Appellant had previously been convicted of disorderly conduct in 2009 after he brandished a gun and threatened McHale and guests visiting McHale's property.

Around 11:00 a.m. on the morning of September 24, 2012, Michelle McHale was working outside training dogs when appellant started yelling at her and

---

[1]     *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2011).

2

threatening her. Michelle called 9-1-1, but before GCSD Deputy M. Bewley could arrive in response to the call appellant went back to his own property. Appellant did not answer his door when Deputy Bewley knocked. When Deputy Bewley saw McHale after unsuccessfully trying to speak with appellant, he told McHale to call him if he saw appellant again. Shortly after noon, Deputy Bewley left the area to pick up lunch. Deputy Bewley had been at a local restaurant for approximately five to ten minutes when he received a call from 9-1-1 dispatch stating that McHale had called again, that yelling had been audible during the call, and that the connection had been lost. Deputy Bewley drove up to a barn located on McHale's property and discovered McHale's body. McHale had been shot once in the head.

Randi Farquhar, a dispatcher for the GCSD, received both 9-1-1 calls from the McHales on September 24, 2012. After the connection was lost during the second 9-1-1 call, she attempted to call McHale back, and, when he did not answer, she dispatched Deputy Bewley back to the scene. The trial court admitted an audio recording of the second 9-1-1 call. During this recording, appellant can be heard yelling at McHale while McHale tries to calm appellant down. On the recording, McHale said, "Don't do it, James," just before the sound of a gunshot. Farquhar then attempted to speak to McHale, but she received no answer before the connection was ultimately lost.

3

GCSD officers apprehended appellant, who had a .30-30 rifle with him, at his residence later that evening. At the time of his arrest, appellant told Deputy B. Baldobino, one of the arresting officers, "It was an accident." Appellant then spoke with officers about the shooting, and the trial court admitted a DVD recording of the interrogation. During his interrogation, appellant generally described his history with McHale and stated that he had gone over to McHale's property earlier that day with a loaded .30-30 rifle, which he brought along with him because he knew that McHale owned guns. Appellant and McHale stood approximately ten to twelve feet from each other while they argued, and appellant admitted that he pointed and aimed the rifle at McHale. Appellant claimed that McHale "lunged" at him, and that was the point at which appellant pulled the trigger on the rifle.[2] At several points throughout the interrogation, appellant admitted pointing the rifle at McHale, cocking the rifle, and pulling the trigger. He also stated multiple times that the shooting was an accident and that he had had no intent to hurt McHale.

---

[2] Ryan Mude, an employee of the Texas Department of Public Safety firearms lab, testified that the rifle was in working order and that this particular rifle required 5 1/2 to 6 1/2 pounds of pressure on the trigger to fire.

At the close of voir dire, appellant made three *Batson* challenges,[3] arguing that the State had impermissibly exercised its peremptory strikes against Prospective Juror No. 5, Prospective Juror No. 36, and Prospective Juror No. 42 on the basis that each prospective juror was African-American.  The prosecutor stated that he struck Prospective Juror No. 5 because she was unemployed and had been charged with four criminal offenses, including assault in 2003, driving with an invalid license in 2006, making a terroristic threat in 2008, and criminal mischief in 2009.  He stated that he struck Prospective Juror No. 36 based on courtroom demeanor: when the prospective juror arrived in the courtroom, he waved at appellant and they gave each other a thumbs up, but the prospective juror did not acknowledge that he knew appellant during voir dire questioning, even though the State asked if anyone knew appellant.  The prosecutor stated that he struck Prospective Juror No. 42 because he had only been employed for eight months, he was under the age of thirty, and he had "no other ties to the community."  Defense counsel did not rebut any of these facially race-neutral explanations, and he did not provide any argument or point to any evidence that the explanations were pretexts for purposeful discrimination.  After considering the arguments of both sides, the trial court denied the *Batson* challenges.

---

[3]     *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986) (prohibiting use of peremptory strikes to challenge prospective jurors on basis of their race).

During the charge conference, defense counsel objected to the trial court's "failure to include an instruction on voluntary conduct." The written charge allowed the jury to find appellant guilty of either the charged offense of capital murder or the lesser-included offense of murder. The jury found appellant guilty of murder, and the trial court assessed punishment at thirty-five years' confinement. This appeal followed.

## Jury Instruction on Voluntary Conduct

In his first issue, appellant contends that the trial court erred by failing to include an instruction in the jury charge on the defense of voluntary conduct.

We use a two-step process in reviewing jury charge error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). First, we determine whether error exists in the charge. *Id.* If error does exist, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction. *Id.* When the defendant properly objected to the error in the charge, reversal is required unless the error was harmless. *Id.*; *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984); *Starks v. State*, 127 S.W.3d 127, 133 (Tex. App.— Houston [1st Dist.] 2003, pet. ref'd, untimely filed) (providing that, to preserve error in jury charge, defendant must object or request specific charge).

The trial court must provide the jury with "a written charge distinctly setting forth the law applicable to the case." *Walters v. State*, 247 S.W.3d 204, 208 (Tex.

6

Crim. App. 2007) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14)). The trial court must instruct the jury on statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence in the case. *Id.* at 208–09. "A defendant is entitled to an instruction on every defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony is not worthy of belief." *Id.* at 209. When reviewing a trial court's ruling denying a requested defensive instruction, we view the evidence in the light most favorable to the defendant's requested instruction. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006); *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). We review the trial court's decision not to include a defensive issue in the jury charge for an abuse of discretion. *See Love v. State*, 199 S.W.3d 447, 455 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000)).

A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession. TEX. PENAL CODE ANN. § 6.01(a) (Vernon 2011). "Voluntary conduct" and "accident" are two distinct defensive theories, and the current version of the Penal Code does not provide for a "defense of accident." *Rogers v. State*, 105 S.W.3d 630, 637–38 (Tex. Crim. App. 2003).

7

"'Voluntariness,' within the meaning of Section 6.01(a), refers only to one's own physical body movements." *Id.* at 638. The Court of Criminal Appeals has stated:

> If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis or other nonvolitional impetus, that movement is not voluntary. The word "accident," however, is a word of many meanings which covers a wide spectrum of possibilities. It generally means "a happening that is not expected, foreseen, or intended." Its synonyms include "chance, mishap, mischance, and misfortune." It includes, but certainly is not limited to, unintended bodily movements. But at least since this Court's decision in *Williams* [*v. State*, 630 S.W.2d 640 (Tex. Crim. App. 1982)], the word "accident" has *not* been used to refer to an "involuntary act" under Section 6.01(a). Thus, for purposes of section 6.01(a), an "accident" is not the same as, and should not be treated as the equivalent of, the absence of any voluntary act.

*Id.* at 638–39 (internal citations omitted) (emphasis in original).

A "voluntariness" instruction under section 6.01(a) is "necessary only if the accused admits committing the act or acts charged and seeks to absolve himself of criminal responsibility for engaging in the conduct." *Peavey v. State*, 248 S.W.3d 455, 465 (Tex. App.—Austin 2008, pet. ref'd); *see also Rogers*, 105 S.W.3d at 639 n.30 ("When a person claims the involuntary-act defense he is conceding that his own body made the motion but denies responsibility for it."); *Gerber v. State*, 845 S.W.2d 460, 467 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) ("[N]o evidence showed that appellant acted involuntarily, i.e., under force externally applied.").

8

In *Joiner v. State*, the Court of Criminal Appeals addressed whether a defendant was entitled to a jury instruction on voluntary conduct. 727 S.W.2d 534 (Tex. Crim. App. 1987). *Joiner* involved the defendant's pulling out a gun from inside his jacket and shooting the complainant. *Id.* at 535. The "only evidence that even remotely raised the issue" of voluntariness was the defendant's testimony that "it was an accident." *Id.* at 537. The court noted, "There was no explanation of what the 'it' was: the statement could have meant that appellant intentionally fired the revolver but did not intend to hit [the complainant]; or, he intended to hit her but not kill her; or, the act of firing the revolver was unintentional." *Id.* The Court of Criminal Appeals "reject[ed] the Court of Appeals' conclusion that the bare statement, 'it was an accident,' sufficiently raised the issue of absence of voluntary conduct." *Id.* It stated, "In any event, there was a voluntary act," and quoted from the dissenting opinion in the court of appeals:

> Even if we assume as true in this case the unintended but fatal discharge of the gun pointed unlawfully at the deceased, the fact remains the *intentional pointing of the weapon was a voluntary act* and the resulting death is imputable to the appellant, who carried the gun concealed on his person, who drew the gun, who pointed it at the deceased from two to three inches distance, and who shot her in the face. *There was no evidence of a scuffle, of the deceased's striking him or the gun, or of any other movement not willed by appellant.* This is clearly voluntary conduct as contemplated by the statute. Appellant does not present a challenge to the other component of the offense: the culpable mental state.

*Id.* (quoting *Joiner v. State*, 696 S.W.2d 68, 73 (Tex. App.—San Antonio 1985) (Butts, J., dissenting)) (emphasis in original).

This case is factually analogous to *Joiner*. Here, the only evidence that raised the issue of voluntariness was testimony from Deputy Baldobino that upon being apprehended appellant stated, "It was an accident," and three statements by appellant during his interrogation, the recording of which was played for the jury, that the shooting was "an accident." In the recording of his interrogation, appellant described what happened with McHale at the time of the shooting. Appellant stated that he approached McHale's property with an already-loaded .30-30 rifle, which he took with him because he knew that McHale owned guns. Appellant admitted cocking the rifle and aiming it at McHale. He stated that McHale, who was standing approximately ten to twelve feet away from him, "lunged" at him. And although appellant stated that he had no intent to hurt McHale, he admitted pulling the trigger while he had the gun aimed at McHale. Ryan Mude, an employee in the DPS firearms lab, testified that the .30-30 rifle used in the offense was operational and required 5 1/2 to 6 1/2 pounds of pressure on the trigger to fire.

The trial court also admitted a recording of McHale's 9-1-1 call. McHale and appellant argued briefly on the recording, and McHale said, "Don't do it, James," just before the sound of a gunshot. There were no sounds on the recording

10

indicating that a physical scuffle occurred, nor did appellant state during his interrogation that a scuffle occurred.

No evidence suggests that appellant's acts of aiming the rifle at McHale and pulling the trigger were "the nonvolitional result of someone else's act, [were] set in motion by some independent non-human force, [were] caused by a physical reflex or convulsion, or [were] the product or unconsciousness, hypnosis or other nonvolitional impetus," nor does appellant argue such on appeal. *See Rogers*, 105 S.W.3d at 638; *Gerber*, 845 S.W.2d at 467 ("[N]o evidence showed that appellant acted involuntarily, i.e., under force externally applied."); *see also Farmer v. State*, 411 S.W.3d 901, 907 (Tex. Crim. App. 2013) ("All that is necessary to satisfy Section 6.01(a) of the Texas Penal Code is that the commission of the offense *included* a voluntary act.") (emphasis in original).

Nevertheless, appellant focuses only on the fact that he told one of the arresting officers that the shooting "was an accident" and argues that this evidence raises the issue of voluntary conduct.[4] As the Court of Criminal Appeals held in

---

[4] Appellant also refers to the closing arguments of both parties, in which both attorneys pointed to appellant's statements calling the shooting an "accident" and stating that he "accidentally pulled the trigger." As stated above, however, the Court of Criminal Appeals has distinguished between the defensive theories of "accident" and "voluntary conduct," noting that "accident" is not a defense under the Penal Code, that attorneys should avoid using the term "accident" to describe an offense under the Penal Code, and that "conduct [is not] rendered involuntary merely because an accused does not intend the result of his conduct." *Rogers v. State*, 105 S.W.3d 630, 637–38 (Tex. Crim. App. 2003) (quoting *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993)).

*Joiner*, however, an appellant's bare statement that his conduct was an "accident"—particularly in the absence of evidence of, for example, a struggle, the deceased striking the appellant or the gun, or some other movement during the commission of the offense "not willed by" the appellant—does not sufficiently raise the issue of lack of voluntary conduct such that the appellant is entitled to a jury instruction on that issue. *See* 727 S.W.2d at 537. The only evidence presented in this case reflects that appellant voluntarily walked over to McHale's property with a loaded rifle, aimed the rifle at McHale, and pulled the trigger. Appellant has pointed to no evidence raising the issue that his actions were anything other than voluntary.[5] *See Gokey v. State*, 314 S.W.3d 63, 69 (Tex. App.—San Antonio 2010, pet. ref'd, untimely filed) ("'Accident,' in the sense of an unintended or unexpected result of conduct, no longer supports the defense of involuntariness. Rather, the evidence must show 'one's own physical body movements' were not voluntary.").

We therefore hold that the trial court did not abuse its discretion in refusing to submit appellant's requested jury instruction on voluntary conduct. *See Rogers*, 105 S.W.3d at 638–39 (describing when voluntary-conduct jury instruction is warranted); *Love*, 199 S.W.3d at 455 (stating that we review trial court's decision not to submit defensive jury instruction for abuse of discretion).

---

[5] We note that appellant does not challenge the sufficiency of the evidence to support the essential element of the requisite culpable mental state.

We overrule appellant's first issue.

## *Batson* Challenges

In his second issue, appellant contends that the trial court erred in denying three *Batson* challenges made when the State used three peremptory strikes against African-American veniremembers.

### A. *Standard of Review and Governing Law*

*Batson v. Kentucky* prohibits the use of peremptory strikes to challenge prospective jurors on the basis of their race. 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986). Pursuant to *Batson*, "a defendant may be entitled to 'a new array' if he can demonstrate, by a preponderance of the evidence, that the prosecutor indulged in purposeful discrimination against a member of a constitutionally protected class in exercising his peremptory challenges during jury selection." *Blackman v. State*, 414 S.W.3d 757, 764 (Tex. Crim. App. 2013); *see* TEX. CODE CRIM. PROC. ANN. art. 35.261 (Vernon 2006) (codifying requirements of *Batson*). The opponent of the peremptory challenge bears the initial burden to make a prima facie case of purposeful discrimination. *See Blackman*, 414 S.W.3d at 764 (quoting *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770 (1995)).

Once the opponent establishes a prima facie case of purposeful discrimination, the burden of production shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the challenge. *Id.* At this

13

stage, the proponent need only tender an explanation that is race-neutral on its face. *Id.* at 764–65. The ultimate plausibility of the race-neutral explanation is considered under step three of the analysis, in which the trial court must determine if the opponent of the strike has satisfied his burden of persuasion to prove by a preponderance of the evidence that the peremptory strike "was indeed the product of purposeful discrimination." *Id.* at 765. "Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pretextual, not genuine, is a question of fact for the trial court to resolve in the first instance." *Id.* (citing *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004)). The proper focus is not on the reasonableness of the asserted race-neutral explanation but is instead on the genuineness of the motive. *Purkett*, 514 U.S. at 769, 115 S. Ct. at 1771–72.

We should not reverse the trial court's ruling on a *Batson* issue unless we determine that the ruling was clearly erroneous. *Blackman*, 414 S.W.3d at 765. In reviewing the record for clear error, we should consider the entire voir dire record, and we need not limit our review to "arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record." *Id.* We should, however, "examine a trial court's conclusion that a racially neutral explanation is

14

genuine, not a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous." *Id.*

## B. State's Use of Peremptory Challenges

Here, defense counsel made three *Batson* challenges, arguing that the State impermissibly used its peremptory challenges against Prospective Juror No. 5, Prospective Juror No. 36, and Prospective Juror No. 42 on the basis that all three prospective jurors were African-American. The State offered the following race-neutral reasons for the exercise of its strikes: (1) Prospective Juror No. 5 was unemployed and had been charged with four prior criminal offenses, including driving with an invalid license, assault, making a terroristic threat, and criminal mischief; (2) the prosecutor saw Prospective Juror No. 36 wave at the defendant when he came into the courtroom and the prospective juror and the defendant "gave each other the thumbs up," but the prospective juror "would not acknowledge that he knew the defendant" when the State asked the venire if anyone knew appellant; and (3) Prospective Juror No. 42 had only been employed for eight months, he was under thirty years old, and he had "no other ties to the community."

At the *Batson* hearing, defense counsel did not offer any argument for why these proffered reasons were a pretext for purposeful racial discrimination, and he did not challenge the prosecutor's statement concerning Prospective Juror No. 36's

15

demeanor. Instead, defense counsel turned to a challenge to the State's use of peremptory strikes against four female prospective jurors. The State pointed out to the trial court that the jury was made up entirely of women and that the defense counsel used each of his peremptory strikes against males. The following discussion among the attorneys and the trial court then occurred:

| The Court: | [Defense counsel], all 12 of these people on your jury are females. Are you—you're saying that they made strikes based upon gender? |
| --- | --- |
| [Defense counsel]: | They didn't have enough strikes to get rid of all of them, Judge. I mean, they got rid of— |
| [State]: | We struck four males. If I was targeting females, I wouldn't have struck the four males. |
| [Defense counsel]: | Well, you had to strike all the blacks, too. |
| The Court: | Those challenges are denied. |

The trial court thus denied each of appellant's *Batson* challenges.

The State offered three facially race-neutral explanations for its use of peremptory challenges against Prospective Jurors No. 5, No. 36, and No. 42. *See Blackman*, 414 S.W.3d at 764. Thus, the burden shifted back to appellant, as the party opposing the use of the peremptory challenges, to prove by a preponderance of the evidence that the State's proffered reasons for the challenges were not genuine but were instead a mere pretext for purposeful racial discrimination. *Id.* at 764–65. Appellant did not, at any point in the proceedings, challenge the State's

16

race-neutral explanations for its strikes, nor did he provide any argument or point to any evidence in the voir dire record rebutting the State's race-neutral explanations and demonstrating that the proffered explanations were mere pretexts for purposeful discrimination.

On appeal, appellant bears the burden to establish that the trial court's denial of his *Batson* challenges was clearly erroneous. *Id.* at 765. Upon the State's proffer of its race-neutral explanations in the trial court, appellant did not attempt to argue why those explanations were not genuine, such as by pointing out non-African-American prospective jurors who shared the same objectionable characteristics yet were not struck by the State, nor does he attempt to do so on appeal. *See Watkins v. State*, 245 S.W.3d 444, 453–54 (Tex. Crim. App. 2008) (performing "comparative juror analysis" that involved considering whether State's proffered explanations for its strikes applied equally to non-protected-class members who were not struck by State in determining whether trial court's decision to overrule *Batson* challenges was clearly erroneous).

Appellant likewise presented no argument or evidence, either in the trial court or on appeal, regarding the racial composition of the entire venire, such that we can consider whether the State used a disproportionate number of its strikes to challenge African-Americans relative to the number of African-Americans on the venire. *See id.* at 451–52 (concluding that State used disproportionate number of

17

strikes against African-Americans when it used 55% of its strikes to exclude 88% of African-Americans on the venire). Appellant also did not rebut the State's observations on the record concerning Prospective Juror No. 36's courtroom demeanor. *See Nieto v. State*, 365 S.W.3d 673, 680 (Tex. Crim. App. 2012) ("We have held that the demeanor of a potential juror is a valid reason to exercise a peremptory strike."); *see also Blackman*, 414 S.W.3d at 767 ("[A] prospective juror's demeanor may be 'considered proved on the record' if the prosecutor recites his observation of that demeanor for the record and defense counsel fails to 'rebut the observation.'").

Instead, aside from summarily stating that the State "produced invalid explanations for its challenges," appellant's only argument in support of his contention that he has carried his ultimate burden of persuasion is that "the State could not have exercised strikes based on gender . . . since[, as he argued at trial,] 'well, you had to strike all the blacks, too' which was accomplished by the State's impermissible use of its strikes, denying Appellant equal protection and demanding reversal in this matter." As the State points out on appeal, defense counsel provided no evidence to support his statement, such as evidence of the racial composition of the venire, and therefore the record does not support defense counsel's statement that the prosecutor, who used three of his twelve peremptory

challenges against African Americans, was attempting to strike all of the African Americans from the venire.

We conclude that appellant has not established that the trial court's decision to overrule his *Batson* challenges was clearly erroneous. *See Blackman*, 414 S.W.3d at 765 (stating that appellate courts "examine a trial court's conclusion that a racially neutral explanation is genuine, not a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous").

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Huddle, and Lloyd.

Publish.   TEX. R. APP. P. 47.2(b).