

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00278-CR

KODY WILLIAM FARMER                                              APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

### FROM COUNTY CRIMINAL COURT NO. 9 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1] ON STATE'S PETITION FOR DISCRETIONARY REVIEW

----------

After reviewing the State's petition for discretionary review, we withdraw our February 17, 2011 opinion and judgment and substitute the following. *See* Tex. R. App. P. 50.

## I. Introduction

In one point, Appellant Kody William Farmer appeals his conviction for driving while intoxicated (DWI). We reverse and remand for a new trial.

----

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

This is the case of the mistaken pill.

Around 8:00 a.m. on April 19, 2008, Farmer rear-ended Randall Cox's vehicle on Interstate 35. After both drivers moved to the shoulder and exited their vehicles, Cox noted that Farmer had difficulty walking around his vehicle—staggering and weaving—and he slurred his words, although Cox could not smell any alcohol on him. Cox asked Farmer for his insurance information, and Farmer gave him a business card. Cox returned to his vehicle and called 911 because he did not think it was safe for anyone in Farmer's condition to be driving. While Cox was on the phone, Farmer returned to his vehicle and drove away.

Cox followed Farmer, and when he reached the top of the exit ramp, he saw Farmer's vehicle at the corner of the service road and an intersecting street; it was impaled on a post. The vehicle's engine was running, the backup lights were on, and the wheels were slowly turning in reverse. Although the door was open, Farmer was still inside. The airbag had not deployed, there was no blood or shattered glass, and Farmer did not appear injured, but he was not responding to the OnStar service representative's inquiries.

Fort Worth Police Officer Timothy Lee, the first officer on the scene, stated that he neither smelled alcohol nor suspected that Farmer had been drinking before the accident. Rather, he believed that Farmer was intoxicated from something other than alcohol because Farmer appeared sluggish and had slurred speech, an unsteady walk, and difficulty keeping his eyes open. Officer

2

Lee testified that Farmer shook his hand, and when he let go, Farmer fell towards him. The officer had to catch him to keep him from falling down, and he put Farmer in his patrol vehicle because he feared Farmer might injure himself by falling. Most of Farmer's answers to Officer Lee's questions were unclear, and he had a difficult time understanding Farmer's speech. Farmer was very cooperative and consented to a blood draw at the hospital. Inside Farmer's vehicle, Officer Lee found a bag containing three prescription bottles: Tramadol HCL, Zolpidem, and Carisoprodol. He also found several blister packs of Benadryl, Amatrix, and Celebrex.

Detective D.M. Carabajal assisted Officer Lee with the DWI investigation. Detective Carabajal testified that Farmer had slurred speech, slow movements, and appeared "out of it," and that Farmer told Detective Carabajal that he had not consumed alcohol. Detective Carabajal did not detect any odor of alcohol. He suspected that Farmer was under the influence of a drug. In response to questioning, Farmer initially indicated that he had taken some Benadryl but later stated that he had taken some Soma and Ultram.[2] Detective Carabajal administered field sobriety tests to Farmer. Although Farmer only displayed two of the possible six clues on the horizontal gaze nystagmus test, he had a hard

---

[2]The charging instrument lists Zolpiden and Tramadol as the controlled substances causing Farmer's impairment. Tramadol is the generic name for Ultram, and Zolpidem is the generic name for Ambien.

time keeping his eyes open and keeping his balance during testing, and he failed both the one-leg-stand and walk-and-turn tests.

At the hospital Farmer told Sandra Enriquez, the nurse who performed the blood draw, that he was taking two prescription drugs, Soma and Ultram. The blood test revealed that Farmer's blood contained 127 nanograms of Ultram per milliliter of blood and 185 nanograms of Ambien per milliliter of blood. These levels were within the range of what one would expect somebody to have if they had taken the commonly prescribed amounts of these drugs within a few hours of the time of the blood draw. Enriquez stated that at the time of the blood draw, Farmer's pupils were very large, almost black and that Ambien can cause this side effect. He also had slurred speech and could barely hold himself up in the chair.

Ambien, which is taken for insomnia, is a prescription drug and a controlled substance.[3] Dr. Angela Springfield, chief toxicologist for the Tarrant County Medical Examiner's Office, testified that someone who took Ambien would have considerable difficulty going about his daily functions, would not be as aware of his surroundings, might be confused, and might have difficulty driving because the effects of Ambien and alcohol are similar in many respects. Ambien's recommended dosage usually induces sleep within fifteen to thirty minutes.

---

[3]The trial court took judicial notice that Ambien is a drug specifically listed under Penalty Group 3 of the Controlled Substances Act.

4

Ultram is also a prescription drug and a dangerous drug; it is a synthetic opiate that is prescribed for pain and that causes drowsiness, dizziness, and sleepiness. Mixing Ultram with Ambien would increase the effects of drowsiness. Ultram and Ambien are both white pills with the same shape, but one is slightly larger than the other. Soma is also a white pill, but an Ambien pill is smaller than a Soma pill.

Farmer testified that he had suffered from chronic back pain due to a work-related injury and that he had taken different pain medications on and off for ten years. He also testified that four days prior to the accident, he was prescribed Soma to control muscle spasms and was given his first prescription for Ambien to help him sleep.[4] He had taken Ultram, on and off, for seven years. Farmer woke up aching almost every morning and usually took Ultram. The labels on both Soma and Ultram warn that they may cause drowsiness, and both his doctor and his pharmacist recommended that he be within minutes of going to bed before taking Ambien. Farmer does not like taking medication at all, so his wife sets the pills out for him and tries to make sure that he takes them. She puts them on top of the microwave, and he grabs them.

Farmer did not remember taking any medications the morning of the two accidents, but he admitted that he obviously had. Usually, if he was commuting from Aledo to Carrollton for work, he would take Ultram before getting in the

---

[4]He had not taken any pills from the Celebrex or Amatrix packets that the doctor also gave to him.

shower, and sometimes Soma. Farmer said that he took Ultram that morning and "I guess Soma. I thought—is what I thought I was taking."

The last thing Farmer remembered before the accident was stopping at the gas station down the road from his house, about twenty miles from where the first accident occurred. Based on the way he appeared in the video from Officer Lee's vehicle, Farmer agreed that he did not have the normal use of his mental or physical faculties. And based on the blood test results, he believed his condition was caused by the Ambien. He stated that he did not intentionally take Ambien that morning and that he had never taken it since.

Kimberly, Farmer's wife, testified that she was afraid Farmer would not take his medication, and because the doctor had stressed how important it was for him to take his pills, she laid them out on top of the microwave daily so she would know that he took them. That morning, she laid out his pills on top of the microwave, separating the Ultram from the Ambien. She did not remember seeing him take the medication that morning, but she remembered it was gone and was certain he had taken both pills because the Ambien she had laid out for that night was gone.

At the close of testimony, the trial court noted that the issue of voluntariness had been raised, but it denied Farmer's requested instruction on the issue. The jury found Farmer guilty of DWI, and the trial court sentenced Farmer to ninety days' confinement, suspended for one year, and a $200 fine, and it placed him on community supervision for a year. This appeal followed.

## III. Voluntary Act

In his sole point, Farmer argues that the trial court erred by denying his request for a jury instruction on whether he committed a "voluntary act." He requested the following instruction:

> A person commits an offense only if he voluntarily engages in conduct, including an act, or omission. Conduct is not rendered involuntary merely because the person did not intend the results of his conduct. Therefore, if you believe from the evidence beyond a reasonable doubt that the defendant . . . did not have the normal use of his mental or physical faculties by reason of the introduction of a controlled substance to-wit: zolpidem, tramadol, or a combination of two or more of these substances, but you further believe from the evidence, or have a reasonable doubt thereof, that [he] . . . *took these drugs by accident, and it was not the voluntary act or conduct of the defendant*, you will acquit the defendant and say by your verdict "not guilty."
>
> You are instructed that involuntary intoxication by prescription medication, or medications, is a defense to prosecution for an offense when it is shown that the accused has exercised no independent judgment or volition in taking the intoxicant; and as a result of his intoxication he did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated. [Emphasis added.]

### A. Standard of Review

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32. When the evidence raises the issue of the conduct of the defendant not

7

being voluntary, the jury must be charged, when requested, on the issue of voluntariness. *Brown v. State*, 955 S.W.2d 276, 280 (Tex. Crim. App. 1997). Failure to give the instruction is subject to a harm analysis. *Payne v. State*, 11 S.W.3d 231, 232–33 (Tex. Crim. App. 2000).

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be some harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) ("A claim of jury-charge error is reviewed using the procedure set out in *Almanza*."). In other words, a properly preserved error will require reversal as long as the error is not harmless. *Almanza*, 686 S.W.2d at 171. In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

## B. Involuntary Act

Farmer argues that he did not intentionally or voluntarily take the Ambien, which he apparently consumed when he took the pills that his wife had set out for

him.[5]  Therefore, he contends, an involuntary act is a defense in his case in that, under the penal code, a person "commits an offense only if he voluntarily engages in conduct."  *See* Tex. Penal Code Ann. § 6.01(a) (Vernon 2003); *Brown v. State*, 290 S.W.3d 247, 250–51 & n.1 (Tex. App.—Fort Worth 2009, pet. ref'd); *Peavey v. State*, 248 S.W.3d 455, 465 (Tex. App.—Austin 2008, pet. ref'd); *Nelson*, 149 S.W.3d at 211–12.

> The court of criminal appeals has described voluntary conduct as follows:

> Voluntary conduct "focuses upon conduct that is within the control of the actor.["] . . .   Thus, before criminal responsibility may be imposed, the actor's conduct must "include[ ] either a voluntary act or an omission when the defendant was capable of action." . . . [T]he "voluntary act" requirement does not necessarily go to the ultimate act (*e.g.*, pulling the trigger), but only that criminal responsibility for the harm must "include an act" that is voluntary (*e.g.*, pulling the gun, pointing the gun, or cocking the hammer).

> This Court has repeatedly discussed the meaning of "accident" and "voluntary conduct" to distinguish the two defensive theories. . . .

> '[C]onduct [is not] rendered involuntary merely because an accused does not intend the result of his conduct.'  *Therefore, the issue of the voluntariness of one's conduct . . . is separate from the issue of one's mental state.*

> . . .

> "Voluntariness," within the meaning of Section 6.01(a), refers only to one's own physical body movements.  If those physical movements are the nonvolitional result *of someone else's act*, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness,

---

[5]We note that taking prescription drugs is not a defense to DWI when the accused voluntarily takes medication that has effects that are known to him.  *See Nelson v. State*, 149 S.W.3d 206, 211 (Tex. App.—Fort Worth 2004, no pet.).

> hypnosis or some other nonvolitional impetus, that movement is not voluntary. The word "accident," however, is a word of many meanings which covers a wide spectrum of possibilities. It generally means "a happening that is not expected, foreseen, or intended." . . . [T]he word "accident" has *not* been used to refer to an "involuntary act" under Section 6.01(a).

*Rogers v. State*, 105 S.W.3d 630, 638–39 (Tex. Crim. App. 2003) (internal citations omitted) (emphasis added). To assert "involuntary act" as a defense, the defendant must produce "evidence of an independent event, such as the conduct of a third party, that could have precipitated the incident." *Rhodes v. State*, 997 S.W.2d 692, 694 (Tex. App.—Texarkana 1999, pet. ref'd) (citing *Brown*, 955 S.W.2d at 280).

We observe that with regard to the "accident" language in Farmer's requested instruction, "a request for an instruction on 'accident' is no request at all . . . . [T]here is no longer any such defensive 'accident' theory which requires a jury instruction." *See Rogers*, 105 S.W.3d at 640. Furthermore, involuntary intoxication is not a defense to DWI. *Brown*, 290 S.W.3d at 250–51; *Nelson*, 149 S.W.3d at 211–12; *Aliff v. State*, 955 S.W.2d 892, 893 (Tex. App.—El Paso 1997, no pet.). In *Brown*, another misdemeanor-DWI case, part of the defense's theory was that he had mistakenly taken Ambien instead of his blood pressure medicine. 290 S.W.3d at 248. We overruled his complaint about the trial court's denial of his involuntary intoxication instruction request because DWI does not have a culpable mental state. *Id.* at 250; *see also* Tex. Penal Code Ann.

§ 49.11(a) (Vernon 2003) ("[P]roof of a culpable mental state is not required for conviction of an offense under this chapter.").

Because DWI has no required proof of a mental state necessary for a conviction, it is a conduct-oriented offense. *Nelson*, 149 S.W.3d at 210. In other words, "I didn't mean to drive while intoxicated" cannot preclude a conviction because the statute merely requires that the accused be found to be intoxicated while operating a motor vehicle, without reference to any intent of his part to become intoxicated. *See* Tex. Penal Code Ann. § 49.04 (Vernon 2003), § 49.11(a). On the other hand, if a third person causes the accused to become intoxicated, such as by slipping a "mickie" in his drink or forcing him to take an intoxicant and get behind the wheel, then the voluntary conduct defense is available. *Cf. Brown,* 290 S.W.3d at 248, 251 (holding no involuntary intoxication when appellant took Ambien instead of his blood pressure medicine when the Ambien pills were a different color and shape than his blood pressure medicine). These possible third party actions do not touch on the accused's mental state or intent, but rather on voluntariness. *Cf. Nelson*, 149 S.W.3d at 208–09, 211–12 (holding no jury instruction required when appellant knowingly and intentionally took the three different prescription painkillers an hour before driving and knew their side effects from past usage); *Aliff*, 955 S.W.2d at 892–93 (holding same when nothing in the record indicated that appellant unknowingly took his prescription drugs for his mental illness and back problems or that he took them without knowledge of their effects).

11

The facts of this case do not squarely fit into one of the categories we have discussed—accident, involuntary intoxication, or involuntary act. However, we hold that it is most closely akin to an involuntary act because the evidence suggests that although Farmer voluntarily took the pills laid out for him by his wife, he involuntarily took the *Ambien* pill because of his wife's act. Therefore, the trial court's denial of Farmer's request for an instruction about the voluntariness of his actions constituted some harm, in that it denied the accused of a defense that, if believed by the jury, could have resulted in his acquittal. *See Brown*, 955 S.W.2d at 279; *Abdnor*, 871 S.W.2d at 731–32; *Almanza*, 686 S.W.2d at 171. We sustain Farmer's sole point.

## V. Substance of the Requested Instruction

The State argues that the trial court did not err by denying Farmer's requested instruction because the proposed instruction improperly commented on the weight of the evidence. The State does not point us to anywhere in the record to show where the substance of the proposed instruction was considered and ruled on by the trial court. *See* Tex. R. App. P. 33.1(a). The record reflects that although the trial court reflected that the proposed instruction was "kind of a comment" on the weight of the evidence, the State did not lodge this specific objection and the parties did not argue the issue before the trial court. Because the issue of the proposed instruction's content was not presented to, considered by, or ruled on by the trial court and because on remand the parties will have an opportunity to present and respond to arguments about, and the trial court will

12

consider and expressly rule on, the substance of the jury instruction to be given, we express no opinion as to the substance of Farmer's proposed instruction as we find the issue unnecessary to resolve Farmer's sole issue—whether an instruction was warranted—and we further conclude that the State's request puts the issue of the instruction's substance prematurely before us.

## VI.  Conclusion

Having sustained Farmer's sole point, we reverse the trial court's judgment and remand this case for a new trial.

BOB MCCOY
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 28, 2011

13