**Opinion filed October 19, 2017**



In The

# Eleventh Court of Appeals

_____

## No. 11-15-00264-CR

_____

## JUAN REYES, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 266th District Court

Erath County, Texas

Trial Court Cause No. CR14149

## M E M O R A N D U M   O P I N I O N

The jury convicted Juan Reyes of the first-degree murder of Keith Lynn Wood II and assessed punishment at confinement for forty years. Appellant now argues that the evidence is insufficient to sustain the verdict of the jury, that the evidence established an accidental shooting, and that the State did not rebut the evidence of accidental shooting. We affirm.

We note first that "accident" is no longer a defense in Texas. *Williams v. State*, 630 S.W.2d 640, 644 (Tex. Crim. App. 1982). In fact, the Court of Criminal Appeals has expressly recommended that members of the bench and bar avoid using the term "accidental." *Id.* We also acknowledge that a claim of "accident" is not the same as a claim of "no voluntary conduct." *Rogers v. State*, 105 S.W.3d 630, 639 (Tex. Crim. App. 2003). However, the trial court in this case gave an instruction on voluntary conduct.[1] Appellant did not object to the jury charge and does not challenge the charge on appeal. We take Appellant's complaint as a challenge to the sufficiency of the evidence to show beyond a reasonable doubt that, when Appellant shot Wood, he (1) acted voluntarily and (2) possessed the requisite *mens rea* to commit first-degree murder.

On October 7, 2013, Appellant and his girlfriend, Lillie Marie Floyd, slept through the entire day, until approximately 5:00 p.m. They had just woken up and ordered pizza when they heard someone banging on their front door. Thinking it was the delivery man, Appellant got up to answer the door. However, when Appellant opened the door, Wood was there.

Although Appellant had never met Wood, he knew of Wood. Specifically, Appellant had heard that Wood was "rowdy," "dangerous," and a "Captain" in the

---

[1] In its charge to the jury, the trial court provided the following relevant instruction:

> You are further instructed that a person commits an offense only if he voluntarily engages in conduct. Conduct is not rendered involuntary merely because the person did not intend the result of his conduct.

> Thus, if you believe from the evidence beyond a reasonable doubt that on the occasion in question the defendant, Juan Reyes, did cause the death of Wood Lynn Wood, II by shooting him with a gun, as alleged in the indictment, but you further believe from the evidence, or you have a reasonable doubt thereof, that the shooting was a result of an accidental discharge of the gun as a result of being struck by the said Wood Lynn Wood, II and was not the voluntary act or conduct of the defendant, you will acquit the defendant and say by your verdict "Not Guilty."

Aryan Brotherhood. Appellant also knew that Wood had been to Appellant's house about a week earlier, looking for Appellant's cousin and roommate, Juan "Gordo" Maldonado. On that occasion, Wood had come to the house with ten other men, apparently intending to beat up Maldonado. When Wood had come the prior week, he yelled that he was looking for the "fat b---h." On the date of the offense, when Appellant answered the door, Wood again said that he was looking for "the fat b---h."

Appellant told Wood that Maldonado was not home, but Wood walked into the house. The two sat in Maldonado's room and began to talk. Appellant noted that Wood seemed "woozy," "drunk," and "impatient."

Wood told Appellant that Appellant owed him money for a welder and a motorcycle. Appellant said that he did not know anything about a welder or a motorcycle. Wood told Appellant that he was "drained" and needed to get high. Appellant asked Floyd, who was moving throughout the house, to hand him a "meth pipe" from his bedroom. Floyd gave Appellant the pipe. Floyd testified that she saw Appellant "start[] hitting it," but Appellant denied that he smoked any methamphetamine that day. Floyd went into Appellant's bedroom and shut the door. From the bedroom, she could hear Appellant and Wood continue to talk, but she could not hear what they were saying.

After Appellant handed Wood the pipe, Wood dropped it between his legs. Wood said to Appellant, "[H]ey, can you pick that up." Appellant refused because he noticed that Wood was reaching into his back pocket and because he "wasn't sure what [Wood] was trying to do." Eventually, Wood picked up the pipe and gave it back to Appellant; he said that he did not want to smoke.

Shortly thereafter, Wood announced that he "had to take a p--s." Appellant led Wood to the kitchen and pointed him toward the restroom door. Wood opened

the door but did not go into the restroom. Instead, he urinated in the hallway and finished urinating on the front porch.

At this point, Appellant insisted that Wood leave and come back the next day when he was sober. Wood again demanded that Appellant pay him for the motorcycle and the welder. Wood began to demand that Appellant pay him for "selling dope . . . in [his] town." Wood told Appellant that he owed Wood money because Wood was "superior," white, and in the Aryan Brotherhood. When Appellant told Wood that he would not pay, Wood threatened to come back the next day with ten guys and kill him. Appellant again told Wood to go home and come back the next day.

At some point—either before Appellant answered the door, or immediately after Wood urinated in the house—Appellant asked Floyd to hand him his pistol. Appellant tucked the pistol into his waistband to ensure that Wood saw that he had a gun.

Wood said that he had to "pee again," and Appellant again pointed him toward the restroom. Wood walked back toward the restroom but stopped at the door to Appellant's bedroom, where Floyd was. Wood again urinated down the hallway. Appellant told Wood to stop or he would get the police involved. Wood responded that he was in the Aryan Brotherhood and that "the cops . . . around Stephenville [did] whatever the h--l [he said]." Appellant again asked Wood to leave. Wood responded that he was "superior" and that Appellant had to "bow down" to him. Appellant told Wood that he "bow[s] down to no man . . . only to God."

Wood then "came at" Appellant. Appellant pulled the gun from his waistband and held it in his right hand. Appellant told Wood to stop, but Wood pushed him backwards. Appellant took two steps backwards, and Wood took two steps to "close the gap" between them. Appellant took another two steps backwards and was

4

"cornered up against the refrigerator." Wood "came at" Appellant again, saying that he wanted to shake Appellant's hand.

Appellant had been holding the pistol in his right hand, so he moved it to his left hand and pointed it at Wood. Appellant's finger was on the trigger.

Wood grabbed Appellant's right hand and said, "You ain't going to do s--t." Wood had his left hand on his backside, as if he was digging for something. Wood then hit Appellant in the face. At the same time, "the gun went off."

Appellant did not remember pulling the trigger. He believed that the trigger went off from impulse:

> I think that -- when the trigger went off, it was out of -- out of a flinch, when he hit me, the gun went off, I mean, I tensed up, the trigger went off, the -- my finger was on the trigger . . . when he hit me -- that he had his hand in his back pocket, and he hit me, I tensed up and the gun went off.

Throughout the trial, Appellant denied that he shot Wood because he was afraid or because he was defending himself.

From inside Appellant's room, Floyd had heard the men move up the hall into the kitchen. It "wasn't even a couple of seconds [she] heard the pop, like a popgun." She did not hear any arguing leading up to the pop sound. Floyd opened the bedroom door and saw Wood hit the floor. She saw blood on the dryer and heard Wood take his last breath. Appellant came around the corner holding the pistol. When Floyd asked Appellant what had happened, Appellant said that Wood "went to slap [him]." Floyd asked, "[S]o you shot him?" Appellant responded, "I can't believe I killed him in one shot."

Appellant and Floyd offered conflicting testimony over who suggested calling the police and who said it would be "crazy" to do so. Regardless, no one ever called 9-1-1 or the police. Instead, Appellant asked Floyd to call Maldonado, and

5

Appellant told Maldonado to come home quickly. Before Maldonado got home, Appellant's friend, John Joseph, came to the house. Joseph told Appellant to get rid of the body because Wood was "a Captain in the [Aryan Brotherhood] and . . . his people will come back after you."

After Maldonado got home, Appellant and Floyd left. Floyd understood that they went to dispose of the pistol. Actually, Appellant went to acquire plastic to line the car trunk.

When they returned to the house, Appellant told Floyd to get the shower curtain. They wrapped Wood's body in the shower curtain and then wrapped the shower curtain with duct tape. As they rolled the body over, Floyd could see that Wood had a single gunshot wound "right in his heart." They rolled Wood's body again in a thick comforter.

Wood's body was carried out of the house and put into the trunk of a car that Floyd had borrowed from a friend before the shooting. Floyd drove away from the house in the borrowed car; Appellant followed her in his pickup. They first went to a gas station. Appellant then instructed Floyd to drive directly to his family's farm in Proctor.

When Floyd arrived at the farm, she backed the car up to a barn. Appellant and Floyd pulled Wood's body out of the trunk and left the body inside the barn. They left the property to return the borrowed car that Floyd was driving. They returned to the farm that night, and they slept in Appellant's pickup until 7:30 a.m. the next morning.

When they awoke, Appellant dug a hole outside the barn door and put Wood's body into it. Appellant had Floyd tamp the dirt as he covered Wood's body. Floyd testified that, as they worked on the hole, Appellant repeated, "no body, no gun, no case." Appellant also repeated this mantra to the investigators when he was detained

6

a month later. According to Floyd, when the grave was finished, Appellant urinated on it.

Floyd and Appellant returned to Stephenville to make sure that the house was clean. Floyd stated that Appellant was meticulous about getting rid of the evidence—with one exception. Appellant kept the shell casing from the shot that killed Wood. Floyd believed that Appellant kept the shell casing as "a trophy" because he was "proud of that one shot being able to take a life." Days later, Appellant melted and disposed of the pistol in a pasture at the farm.

Ten days after the shooting, a missing person's report was filed in connection with Wood's disappearance. Nearly a month later, on November 13, Investigator Russell Ford of the Stephenville Police Department received a report that someone had seen a deceased person at a residence in Stephenville. The reporting witness was identified as Joseph, who did not testify at trial. Investigator Ford conducted an interview with Joseph at the Stephenville Police Department. During that interview, Investigator Ford learned that Joseph saw Wood's body at Appellant's house. Based on this information, the Stephenville police secured and executed a "no-knock" evidentiary search warrant for Appellant and Maldonado's house. Early the following morning, Appellant was pulled over in Comanche; he was driving Maldonado's pickup. Law enforcement personnel took Appellant to the Stephenville Police Department.

Officers read Appellant his *Miranda*[2] rights. He waived his rights and agreed to an interview. Appellant initially denied that he knew Wood. Eventually, he admitted that Wood had been in his home. Appellant also admitted that he shot Wood. However, over the course of his interview, Appellant offered two different

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

7

explanations for shooting Wood. First, he said that it was an accident, but later he said that it was because Wood was going to "slap him . . . or strike him" or was "going for [Wood's] waist."

Appellant also admitted that he moved the body, but he refused to tell investigators where it was located. Ultimately, police secured an interview with Floyd, who provided a map to the place where Appellant buried Wood's body. A search warrant was obtained for the farm, and Wood's body was exhumed. A medical examiner confirmed that Wood died from a single gunshot wound to the chest.

We review the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). As the sole judge of the credibility of the witnesses, the jury is free to accept or reject any or all of a witness's testimony, and we defer to the jury to resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences to reach ultimate facts. *Gross v. State*, 380 S.W.3d 181, 185 (Tex. Crim. App. 2012); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Under Section 19.02 of the Texas Penal Code, a person commits the offense of first-degree murder if he intentionally or knowingly causes the death of another person. TEX. PENAL CODE ANN. § 19.02(b)(1), (c) (West 2011). While the defense of accident is no longer present in the Penal Code, the Court of Criminal Appeals has long held that homicide that is not the result of voluntary conduct is not to be

8

criminally punished. *Brown v. State*, 955 S.W.2d 276, 280 (Tex. Crim. App. 1997); *see also* PENAL § 6.01(a). Appellant did not deny that he shot Wood. Thus, the State had the burden of proving beyond a reasonable doubt that Appellant acted voluntarily and with the requisite intent when he shot Wood.

"'Voluntariness,' within the meaning of Section 6.01(a), refers only to one's own physical body movements." *Rogers*, 105 S.W.3d at 638. It is "separate from the issue of one's mental state." *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993). Thus, conduct is not rendered involuntary merely because an accused does not intend the result of his conduct. *Id.* Additionally, when an accused engages in some voluntary conduct with the requisite mental state, "[t]hat such conduct also includes an involuntary act does not necessarily render engaging in that conduct involuntary." *George v. State*, 681 S.W.2d 43, 45 (Tex. Crim. App. 1984). Rather, the Court of Criminal Appeals has made it clear that, absent an intervening force, pointing a loaded gun at another person is a relevant voluntary movement. *See, e.g.*, *Rogers*, 105 S.W.3d at 638–39; *George*, 681 S.W.2d at 47. Examples of an intervening force would be another person knocking the gun or bumping the shooter. *Brown*, 955 S.W.2d at 279–80; *Garcia v. State*, 605 S.W.2d 565, 566 (Tex. Crim. App. [Panel Op.] 1980).

For example, in *George*, the defendant pointed a revolver toward the victim's face and cocked the hammer. 681 S.W.2d at 44. The defendant confessed that "the hammer slipped off [his] thumb" and the gun "went off." *Id.* The defendant insisted that the shooting was "an accident." *Id.* The court held that, as a matter of law, where one or more voluntary acts led to the actual shooting, the fact that the actual discharge of the gun was the result of an involuntary movement alone did not render the shooting involuntary. *Id.* at 47. In so holding, the court distinguished prior cases where the actual discharge was caused by the actions of another individual. *See*

9

*Brown*, 955 S.W.2d at 277 (defendant was bumped by another person from behind, which caused the gun to discharge); *Garcia*, 605 S.W.2d at 566 (victim pulled the gun out of defendant's hand, causing it to discharge).

In *George*, the court stated that only "precipitation by another individual" can render otherwise voluntary conduct involuntary. 681 S.W.2d at 47. There is no evidence that Wood ever touched the gun or Appellant's body in a way that would cause the gun to go off. *See Adanandus*, 866 S.W.2d at 230 (holding that evidence was sufficient to prove shooting was voluntary where there was "no evidence that appellant and the deceased struggled over the gun or that the deceased ever had his hand on the gun"). Rather, Wood shook Appellant's right hand and hit Appellant in the face. This motion caused Appellant, who already had the pistol in his left hand, pointed at Wood, with his finger on the trigger, to "flinch." Ultimately, this flinch caused the gun to go off. Appellant's flinch is more similar to a finger "slipping" on the trigger than a push from behind: "[T]here is no evidence that the gun fired on its own volition." *Id.*; *accord George*, 681 S.W.2d at 44; *cf. Garcia*, 605 S.W.2d at 566. Accordingly, we hold that the evidence is sufficient to show that Appellant acted voluntarily when he shot Wood.

We now turn to the *mens rea* element of the offense. A person has the requisite *mens rea* for first-degree murder when he "intentionally or knowingly causes the death of an individual." PENAL § 19.02(b)(1). The Texas Penal Code provides that "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." PENAL § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

10

Murder, intentionally or knowingly committed, is a result-oriented offense. *Roberts v. State*, 273 S.W.3d 322, 328–29 (Tex. Crim. App. 2008).

Direct evidence of the requisite intent or knowledge is not required. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Indeed, proof of a culpable mental state almost always depends upon circumstantial evidence. *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.). For this reason, circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing guilt. *Id.* at 14–15.

A jury may infer intent or knowledge from any facts that tend to prove the existence of intent or knowledge. *Hart*, 89 S.W.3d at 64. Those facts might include the acts, words, and conduct of the accused, as well as the method used to commit the crime and the nature of wounds inflicted on the victim. *Id.* In reviewing these things, the jury is entitled to consider events that occurred "before, during, and after the commission of the offense." *Pitonyak v. State*, 253 S.W.3d 834, 844 (Tex. App.—Austin 2008, pet. ref'd). In our review, we will give deference to the duty of the factfinder to resolve credibility issues and to weigh the evidence, including any reasonable inferences from that evidence. *Hooper*, 214 S.W.3d at 13.

"[A] jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon." *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). When, as in this case, the evidence shows that a deadly weapon was used in a deadly manner, "the inference is almost conclusive that [the defendant] intended to kill." *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986) (quoting *Hatton v. State*, 21 S.W. 679, 679 (Tex. Crim. App. 1893)). A gun is a deadly

weapon per se. PENAL § 1.07(a)(17)(A). Appellant testified that he used the gun only to show that he was "within [his] rights" in his own home. If that were the case, Appellant could have done the same using an unloaded gun. "Because Appellant failed to remove the bullets and used a gun he knew to be loaded, the jury could reasonably infer an intent to kill." *Mouton v. State*, 923 S.W.2d 219, 223 (Tex. App.—Houston [14th Dist.] 1996, no pet.).

The jury could also infer Appellant's intent to kill from his conduct following the shooting. Rather than calling the police, Appellant conversed with at least three different people—Floyd, Maldonado, and Joseph—as to how to dispose of Wood's body. He then systematically wrapped Wood's body, moved the body to another site, and buried it. Appellant testified that he failed to call the police and instead hid the body because he was afraid of retaliation from the Aryan Brotherhood and because he was afraid that the police would not believe him. However, the jury was free to reject this testimony. The jury also heard testimony that Appellant meticulously cleaned the house afterwards, except for saving the shell casing from the bullet that killed Wood. Based on this circumstantial evidence, the jury could rationally infer Appellant's intent.

Finally, as additional circumstantial evidence of guilt, when Appellant was detained, he refused to disclose where he buried Wood's body. He also offered alternative explanations for shooting Wood: first that he shot Wood accidentally and second that he shot Wood in self-defense. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."). We have examined all the evidence and the reasonable inferences to be drawn therefrom, and we conclude that a rational

jury could have found beyond a reasonable doubt that Appellant possessed the requisite intent to shoot and kill Wood.

We have reviewed the evidence in the light most favorable to the verdict, and we hold that a rational trier of fact could have found beyond a reasonable doubt that Appellant intentionally or knowingly caused the death of Wood.  Appellant's sole issue on appeal is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE


October 19, 2017

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.