

# NUMBER 13-18-00189-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

TAMORA FOSTER,                                                    Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

---

### On appeal from the 252nd District Court
### of Jefferson County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Tijerina[1]
### Memorandum Opinion by Justice Tijerina

A jury convicted Tamora Foster of continuous sexual abuse of a child.  *See* TEX.

PENAL CODE ANN. § 21.02.  By four issues, which we address as three, Foster argues that

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket-equalization order issued by the Supreme Court of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001.

the trial court erred by (1) allowing a detective to testify that the child's demeanor was consistent with that of a child who had been sexually abused because the probative value of such testimony was outweighed by its prejudicial nature; (2) allowing speculative testimony; and (3) refusing Foster's requested jury charge on voluntariness. We affirm.

## I.  BACKGROUND

At trial, Foster's son C.R.[2] testified that when he was eleven years old, he walked into his mother's room while she was having sex with her boyfriend, James. C.R. tried to leave, but Foster encouraged him to join in on the "fun" they were having. According to C.R., Foster kept "being all showy and showing [him] her parts." C.R. repeatedly refused, but when Foster insisted, he felt he had no choice but to approach her. C.R. testified that he was in shock and remained silent for the remainder of the encounter while she helped him undress. As Foster got "on top of his private part," she asked him to talk dirty to her. He testified that he "was just so confused and conflicted and just so many things all at once." C.R. stated that when his private part was inside his mother's vagina, "It felt so wrong. It just felt wrong all over it, all over it, just everywhere." He further stated that Foster regularly did drugs in front of him, and she was "drugged up" when this encounter happened. According to C.R., Foster let out a "big moan" when she climaxed.

C.R. told the jury that his mother's "big moan" has been haunting him with terrifying flashbacks: "like a punched-in-the-gut feeling. It's like the gut feeling is so bad it actually feels like someone has literally punched you in your gut. And every so often, it will repeat and it will just get worse and worse every time." C.R. also testified that James was masturbating while watching. Afterwards, Foster approached him and asked him not to

---

[2] To protect the identity of children, we refer to them by aliases. *See* TEX. R. APP. P. 9.8(b).

tell anyone about their encounter or she would go to jail.

The second time this happened about a year later, C.R. recalled that he wanted a pizza, and he went into Foster's bedroom to ask for it. When C.R. realized Foster was having intercourse with James, again, he attempted to leave. According to C.R., Foster was "doped up," got out of bed, and got in front of him to prevent him from leaving the room. He testified that Foster performed oral sex on him before getting on top of him "like last time."

Detective Elizabeth Foshee with the Jefferson County Sheriff's Office observed C.R.'s interview with a child advocacy center via closed-circuit TV. She testified that throughout the interview, C.R. was crying, angry, upset, and "very, very emotional." Detective Foshee interviewed Foster and James. According to Detective Foshee, both Foster and James admitted that Foster had sex with her son. Foster blamed other people for her actions including C.R.'s father and Foster's grandmother.

Ronda Devenzio, a counselor at C.R.'s school, testified that C.R. was crying uncontrollably when he made his outcry. She told the jury that C.R. is emotionally disturbed, gets easily frustrated, cries often, and shuts down.

Kim Hanks, a counselor at a child advocacy center testified that she interviewed C.R., and his behavior and demeanor were consistent with a child who had been sexually assaulted. According to Hanks, C.R. was very emotional and angry during the interview. C.R. told Hanks that Foster kept calling him in and telling him it was okay when he repeatedly refused to participate in the act.

Taylor Stevens, a Child Protective Services (CPS) adoptive home developer, went to C.R.'s home to interview him. According to Stevens, C.R. was very frustrated that

3

sexual incidents involving his mother were occurring and nothing was being done about it. C.R. told Stevens that as soon as C.R.'s father dropped him off at Foster's home, Foster immediately pulled out her drugs. Foster was adamant about C.R. joining her and James. C.R. was embarrassed about the incident, and he told Stevens he did not want to return to foster care.[3]

Brenda Garison, a sexual assault nurse examiner, testified that she remembers C.R. distinctly because he was very angry and teary-eyed, and he would repeatedly hit his hands on his knees. Garison believed C.R. was angry at the system and made excuses for the system, such as blaming himself for giving in to Foster's sexual demands.

Kelli Spell, another school counselor, testified that C.R. is anxious, has a low frustration level, and is very intelligent. Spell stated that C.R. was terrified about going back into the foster system and broke down in hysteria in her office because of his past experiences in the foster system.

Charita Dangerfield, a CPS adoption caseworker, testified that C.R. was afraid to tell anyone about the sexual abuse because he did not want to get his mother in trouble, yet he was angry that Foster told him it was okay to have intercourse with her. In his interview, C.R. elaborated about what he witnessed between Foster and James and the details that transpired between Foster and C.R.

Nancy Blitch, a CPS family coordinator, testified that during her interview, C.R. was crying and started tearing a tissue into various pieces in anger when he was describing the sexual abuse. According to her, he was very detailed and told her multiple

---

[3] C.R. was previously in the foster system because of Foster's neglectful supervision and drug use. Moreover, C.R. was allegedly raped while in the foster system according to several witnesses that testified at trial.

times how embarrassed he was because he felt like he maybe willingly had sex with his mother. He was also afraid of getting into trouble and going to "juvi."

Julie Prudhome, a clinical director at a child advocacy center, diagnosed C.R. with post-traumatic stress disorder. According to her, C.R. had intrusive thoughts, difficulty sleeping, changes in mood and cognition, suffered from hyperarousal, and exhibited avoidant behavior, among other things. She stated that she had approximately fifty sessions with C.R., and he confided in her that he felt ashamed and betrayed by Foster.

Foster testified as to her psychiatric treatment and the various diagnoses she has received over time. Foster stated she did not remember having intercourse with C.R., but she remembered being naked in her room while James was performing oral sex on her when C.R. walked in the room, and James later masturbated. According to Foster, she believed that she was having sex with her son in a dream: "I had a dream that [C.R.] had sex with me, but I don't know . . . that [C.R.] was on top of me. I dreamed that before, I believe." She further clarified that she was not in her right state of mind on the day she had sex with her son because she was high. Foster apologized for the sexual assault and further stated that C.R. was telling the truth. Foster testified that she felt like terminating her parental rights was the best thing for C.R.

A jury found her guilty of continuous sexual abuse of a child and sentenced her to fifty years' imprisonment. This appeal followed.

## II.  ADMISSION OF EVIDENCE

By her first issue, Foster argues that the trial court erred by allowing Detective Foshee to comment on whether C.R.'s behavior and demeanor were consistent with that of a child who had been sexually abused. Foster complains that the testimony was

5

speculative because Detective Foshee was not an expert and the prejudice outweighed its probative value. By her second issue, Foster asserts that the trial court erred by allowing Detective Foshee to speculate as to whether Foster was a "willing participant" regarding the allegations against her.

## A. Standard of Review

We review the trial court's ruling on the admission of evidence for an abuse of discretion. *See Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Amberson v. State*, 552 S.W.3d 321, 327 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc). When considering a trial court's decision to admit or exclude evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Id*. at 391; *see Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003). If the trial court's decision to admit or exclude evidence aligns with any theory of law applicable to the case, its decision will not be disturbed. *See Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006); *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

## B. Harm Analysis

For purposes of our analysis, we will assume—without deciding—that Detective Foshee's testimony was improper. This error is non-constitutional and requires reversal only if it affects Foster's substantial rights. *See Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011) (providing that the erroneous admission of evidence is non-

constitutional error); *see* TEX. R. APP. P. 44.2(b) (providing that non-constitutional error "that does not affect substantial rights must be disregarded"). We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

"In considering the potential to harm, the focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict." *Barshaw*, 342 S.W.3d at 93. We reverse for non-constitutional error if we have grave doubt that the result of the trial was free from the substantial effect of the error. *Id*. "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id*. In assessing the likelihood that the jury was improperly influenced, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id*. We may also consider the jury instruction given by the trial judge, the state's theory, defensive theories, closing arguments, voir dire, and whether the State emphasized the error. *Id*. The weight of evidence of the defendant's guilt is also relevant in conducting a harm analysis under Rule 44.2(b). *See Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008).

Here, the jury heard testimony from C.R. describing the sexual abuse. Specifically, the jury heard C.R. testify that on two occasions, when he was eleven and twelve, Foster had sexual intercourse with him, and on the second occasion, she performed oral sex on

7

him. He provided details about the abuse, including specifics about what Foster did and when, what she said, where they were, and how it made him feel. He also told the jury about Foster specifically asking him not to tell anyone or she would go to jail. Moreover, he provided many details about Foster's drug use, which Foster admitted.

In addition to C.R.'s testimony, the jury heard other evidence supporting a finding of Foster's guilt, such as Detective Foshee's testimony that Foster and James admitted to Foster having sex with her son. The jury also heard the outcry testimony from two of C.R.'s school counselors; the sexual assault nurse examiner's testimony concerning the sexual assault examination she performed and the details that C.R. provided, which were consistent with his testimony to the jury; the forensic interviewer's testimony about C.R.'s demeanor when he described the abuse to her; a child advocacy counselor's testimony that C.R.'s behavior and demeanor was consistent with a child who had been sexually abused; CPS representatives detailing what C.R. told them about the allegations against Foster; and C.R's personal counselor's testimony.

Further, Foster acknowledged that "sexual intercourse happened," but she did not believe she was in her right state of mind at the time. Foster also testified about her drug use and her psychiatric conditions. Additionally, Foster testified that C.R. was telling the truth about what took place.

Considering the evidence as whole, we conclude that the evidence supporting the jury's verdict was strong, and the two complained-of-comments did not strengthen or detract from the evidence at trial. Moreover, Detective Foshee's testimony did not inherently connote C.R.'s veracity, and, given the state of the record, were fairly innocuous. We also note the State's limited focus on Detective Foshee's testimony.

8

Removing Detective Foshee's comments from consideration, there remains significant evidence supporting the jury's finding of guilt. *See Motilla*, 78 S.W.3d at 355. Given the detailed nature of C.R.'s testimony and other evidence in the record, we have fair assurance that hearing Detective Foshee's brief comments did not improperly influence the jury. Thus, because the error, if any, did not have a substantial and injurious effect or influence in determining the jury's verdict, it did not affect Foster's substantial rights. Accordingly, the trial court's error, if any, was harmless. We overrule Foster's first two points of error.

### III. JURY CHARGE

In her last issue, Foster argues that the trial court erred by denying her requested jury charge on voluntariness.

### A. Applicable Law

A defendant is entitled, upon a timely request, to an instruction on any defensive issue raised by the evidence, provided that the defendant timely requests an instruction on that specific theory and the evidence raises that issue. *Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003). "Voluntariness," within the meaning of § 6.01(a) of the penal code, refers only to one's own physical body movements. *See* TEX. PENAL CODE ANN. § 6.01; *Rogers*, 105 S.W.3d 638. "If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis or other nonvolitional impetus, that movement is not voluntary." *Rogers*, 105 S.W.3d at 638.

### B. Analysis

9

A defendant's testimony alone may be sufficient to raise a defensive theory, *see id.*, but Foster's testimony did not unambiguously develop the theory that her acts were "the nonvolitional result of someone else's act, [were] set in motion by some independent non-human force, [were] caused by a physical reflex or convulsion, or [were] the product or unconsciousness, hypnosis or other nonvolitional impetus," nor does she argue such on appeal. *See id.* There was no evidence that Foster acted involuntarily, i.e., under an external force. *Id.* In fact, Foster does not dispute that she engaged in intercourse with her eleven-year-old son. Instead, she claims the jury should have been charged with voluntariness "due to her mental state, mental health conditions, substance abuse, and mental capacity." However, "the issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state." *Rashann Maurice Brown v. State*, 89 S.W.3d 630, 633 (Tex. Crim. App. 2002). "All that is necessary to satisfy Section 6.01(a) of the Texas Penal Code is that the commission of the offense included a voluntary act." *Farmer v. State*, 411 S.W.3d 901, 907 (Tex. Crim. App. 2013). Moreover, because voluntary intoxication is not a defense to the commission of a crime, evidence of Foster's substance abuse does not negate the mens rea elements of intent or knowledge, and here Foster admitted she was intoxicated when she had intercourse with her son. *See* Tex. Penal Code Ann. § 8.04(a). Therefore, we conclude that Foster was not entitled to a voluntariness instruction, and the trial court properly denied her request, even when the evidence is viewed in her favor. *See Farmer*, 411 S.W.3d at 908. We overrule her third issue.

## IV. Conclusion

We affirm the trial court's judgment.

10

JAIME TIJERINA,
Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
30th day of January, 2020.