

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00371-CR

———————————————

MARVIN RODRIGUEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1432306D

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion on Remand by Justice Birdwell

## MEMORANDUM OPINION ON REMAND

A jury convicted appellant Marvin Rodriguez of the offense of murder and assessed his punishment at twenty years' imprisonment. After the trial court sentenced Rodriguez, he appealed to our court, and we affirmed his conviction. *Rodriguez v. State*, No. 02-17-00371-CR, 2019 WL 3491647, at *1 (Tex. App.—Fort Worth Aug. 1, 2019) (mem. op., not designated for publication), *rev'd*, 629 S.W.3d 229 (Tex. Crim. App. 2021). On petition for discretionary review, the Texas Court of Criminal Appeals held that the trial court had erred by denying Rodriguez's requests for jury instructions on the justification defenses of self-defense and defense of a third person and remanded the case to us to perform a harm analysis.[1] *Rodriguez*, 629 S.W.3d at 231, 237.

On remand, both Rodriguez and the State filed briefs, with Rodriguez arguing that he suffered some harm and the State arguing that the errors were harmless. We hold that the errors caused some harm, reverse Rodriguez's conviction, and remand his case to the trial court for a new trial.

---

[1]Although Rodriguez objected to the failure to include three justification defenses—necessity, self-defense, and defense of a third person—and although all three justification defenses are referenced in the Texas Court of Criminal Appeals' opinion, *Rodriguez*, 629 S.W.3d at 231, both Rodriguez and the State assert that the remand is to perform a harm analysis for only the failure to include the self-defense and defense-of-a-third-person instructions. Consistent with the parties' understanding, we restrict our harm analysis to the failure to instruct the jury on the justification defenses of self-defense and defense of a third person. *See Darkins v. State*, 430 S.W.3d 559, 571 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("When deadly force in self-defense is the conduct that is allegedly 'immediately necessary' under section 9.22, [the necessity provision under the Texas Penal Code,] the defense of necessity does not apply."). We note that Rodriguez describes his case as "largely about deadly force self-defense."

## I. Standard of Review

Rodriguez asserts and the State concedes that he preserved his charge issues for appellate review. Preserved charge error requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In other words, a properly preserved error, unless harmless, requires reversal. *Almanza*, 686 S.W.2d at 171. A reviewing court must consider and analyze (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816; *see also Almanza*, 686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole.").

## II. Background

Summarizing the evidence generally, after a football game at AT&T Stadium, a fight broke out in the parking lot between Rodriguez's two brothers—Candido and Javier—and two other men, Miguel Tamayo and Francisco Leal. As one witness put it, the fight was among friends: "[T]hey were all friends." Most had been drinking.

Candido testified that the fight started after he had thrown an open can of hot beer on a pile of trash while cleaning up. Beer splashed on Tamayo, and Tamayo took offense.

Rodriguez testified that he tried to intervene with his fists but was hit and knocked down twice, so he went to Javier's Hummer, where he retrieved his pistol. The gun was necessary, Rodriguez explained, because he feared for his and Candido's lives. According to Rodriguez, while he was tussling with Richard Sells, one of Candido's attackers, Rodriguez's gun discharged. Sells suffered a fatal wound. Other witnesses, however, described Sells not as an attacker but as someone trying to break up the fight; they asserted that Rodriguez, without anyone's interference, pointed the gun at Sells and shot him. *Rodriguez*, 629 S.W.3d at 233–34.

### III. Discussion

We divide our harm analysis into six subsections. Initially, we consider (A) the jury charge as a whole, (B) the arguments of counsel, (C) the entirety of the evidence, and (D) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816; *see also Almanza*, 686 S.W.2d at 171. As shown below, Rodriguez's justification defenses were threaded throughout the trial. They appeared everywhere except in the charge. After addressing subsections (A) through (D), we address under subsection (E) the State's arguments that (1) the errors were harmless because the evidence was overwhelming and (2) the jury's negative finding of sudden passion during the punishment trial

4

supports holding the errors harmless. We reject both arguments. Finally, under subsection (F), we hold that the charge errors caused some harm.

## A. Charge as Submitted

The trial court's jury charge posed the following: (1) Did Rodriguez (a) intentionally or knowingly cause Sells's death by shooting him or (b) commit an act clearly dangerous to human life—namely, shooting Sells with a firearm—with the intent to cause Sells serious bodily injury, which thereby caused his death, *see* Tex. Penal Code Ann. § 19.02(b)(1), (2) (murder), and if not, (2) did Rodriguez recklessly cause Sells's death by shooting him with a firearm, *see id.* § 19.04(a) (manslaughter)? If not, then the charge instructed the jury to find Rodriguez not guilty of any offense.

The charge included an instruction on whether Rodriguez acted voluntarily. "Involuntariness of the act on which the state relies would seem to be '[a] ground of defense in a penal law that is not plainly labeled in accordance with [Chapter 2 of the Penal Code].'" Comm. On Pattern Jury Charges, State Bar of Tex., *Tex. Crim. Pattern Jury Charges: Lack of Voluntary Act* CPJC 21.1 (2015) (quoting Tex. Penal Code Ann. § 2.03(e)). Regarding voluntariness, the jury charge provided,

> You are instructed that a person commits an offense only if he voluntarily engages in conduct, including an act.
>
> "Act" means a bodily movement, whether voluntary or involuntary, and includes speech.
>
> "Conduct" means an act and its accompanying mental state.

5

**B. Arguments of Counsel**

Although the charge did not include any justification defenses, elements of Rodriguez's justification defenses found their way into both the State's and Rodriguez's closing arguments.

**1. State's Closing Argument**

During closing arguments, the State never broached the voluntariness issue. It argued that the jury's choices were between convicting Rodriguez for murder or manslaughter, but it contended that the evidence supported murder.

**2. Rodriguez's Closing Argument**

Defense counsel addressed whether Rodriguez's act was voluntary: "Was the -- was the act a voluntary act on the part of the defendant? And did the offense occur as these gentlemen say or as these two gentlemen say?" But defense counsel did not limit his arguments to voluntariness.

Counsel's arguments branched off into elements of Rodriguez's justification defenses. For example, defense counsel argued that Rodriguez was terrified:

> Why did Mr. Rodriguez put a weapon on [Lester] Peters?[2] Because he's afraid to death. He didn't wake up that morning and say, ["]I think I'm ready to rumble, I want to go kill somebody.["] He's afraid to death. And so this whole notion that it was just a fistfight out there I think is very unfair. It was not a fistfight. It was anything but.

---

[2]Rodriguez believed that Peters was one of the assailants; Rodriguez confronted Peters with the gun before confronting Sells. *Rodriguez*, 629 S.W.3d at 234.

6

[Ordietrick (Jarel)] Westbrook[3] wouldn't -- Westbrook said he's not getting down in that crowd. Daisy Leal[4] said she was terrified. The defendant said he was terrified.

Counsel later repeated, "[Rodriguez] was in terrible, terrible fear in a terrible situation."

Rodriguez's attorney also discussed defense of a third person:

If you look at [Rodriguez's] hands, he tried at least with his body to help himself and help his brothers and he failed.

Look, you know, I don't know how many of you have brothers. I'd take a bullet for mine. Who wouldn't[?] Who would not run to the aid of their child or their wife or their brother or their dad when you're in a chaotic, screaming situation, you're surrounded by drunk men, big men, and it's just, what, like a thunderstorm that came over him. You thought one minute ago these are my friends and now they're not my friends.

Put yourself in -- put yourself in those shoes if you can just for a moment. Imagine yourself in those shoes. Mr. Rodriguez is not a murderer.

Thereafter, though, defense counsel returned to whether pulling the trigger was a voluntary act: "[T]he involuntarily pulling of a trigger is a defense." Counsel continued, "This weapon discharged not by conscious objective or desire, not by intent, not by recklessness on the part of Mr. Rodriguez. It discharged through an involuntary act, through the external act of an external force."

---

[3]Westbrook was one of the people tailgating with Peters.

[4]Daisy Leal was one of the women involved in the fight.

### 3. State's Rebuttal Argument

In rebuttal, the State addressed whether Rodriguez had acted voluntarily:

> And let's talk about the facts and not the emotion. Because what this boils down to is whether or not the defendant intentionally or knowingly or voluntarily engaged in actions that caused the death of Richard Sells, and we know that that's true. There was a ton of evidence to show that.

But the State characterized Rodriguez's defense more as an accidental shooting than an involuntary one:

> We put in these medical records [from Rodriguez's trip to the hospital after the shooting]. . . .[5]
>
>     . . . .
>
>     What else is noted? No distress. He's not in any distress. Psychiatric evaluation, he has a normal mood and affect, his speech is normal, and behavior is normal. Not phased one bit. And don't you know, don't you know if somehow a gun accidentally had gone off and you had killed someone, don't you know you're going to be upset, you're going to [be] stressed, you're going to be frantic, you're going to be nervous, and he's none of that. None of it. He's lying and he's calm. It's all good.

The State also briefly addressed self-defense:

> And [Rodriguez] gets that gun out, and he carries it back with him. They want you to believe he was in fear for his life. He was afraid he was going to be murdered. Well, if that's the case, why isn't he running to get a police officer? Why isn't he getting in that Hummer and driving off?

---

[5]One of the responding officers said that Sells, Rodriguez, and Javier were taken to the hospital that night.

## C. Entirety of the Evidence

When reviewing the evidence, we focus on five aspects: (1) the evidence regarding self-defense and defense of a third person; (2) the evidence regarding use of deadly force; (3) the evidence regarding Rodriguez's intent to kill (specifically, his encounter with Peters); (4) the evidence when viewed through the prism of the charge as given; and (5) the evidence when viewed through the prism of a charge that included Rodriguez's justification defenses. With the justification defenses included, the evidence looks quite different.

### 1. Self-Defense and Defense of a Third Person

Testimony showed that Rodriguez and several other people had entered the fight to try to stop it.

#### a. Peters

For example, Westbrook said that Peters had jumped into the melee "to help the girls that were getting their face[s] kicked in and stuff." Peters was thus one person who, according to Westbrook, entered the fight to try to defend third persons.

#### b. Girlfriends or Wives

And when asked why the women were involved, Westbrook responded, "I remember they were just trying to help, I guess, their boyfriends or husband, whatever, they were at the bottom of the pile." The girlfriends and wives were thus potentially other individuals who entered the fray to try to defend third persons.

## c. Sells

Sells's fiancée, Angelica Secundino, said that she and Sells were watching the fight from a distance when the fight eventually moved to where they were. Secundino related that Sells became involved only after someone had been pushed into her. At that point, she described Sells as trying to help and as twice trying to pull Candido—whom she described as being Sells's good friend—away when Rodriguez confronted and shot Sells.[6] Thus, there was testimony that Sells too had tried to help third persons—Secundino and Candido.

## d. Rodriguez

Rodriguez said that Peters had jumped into the fight and was participating in it and that when he returned with the gun, he picked Peters because "[h]e was the first one I came [to]." Summing up his confrontation with Peters, Rodriguez said, "He walked off."

As for Sells, Rodriguez said that he "was on top of my brother punching him." Tamayo stated that he saw Sells with his hands around Candido's waist. According to Tamayo, Candido turned around and started swinging at Sells, both men wrestled and

---

[6]Secundino stated that Candido was fighting with someone whom she could not identify because, due to all the other people in the area, she could not see. She said that Sells tried to pull Candido away when Rodriguez pushed Sells back. When Sells tried to pull Candido away a second time, Rodriguez shot Sells. She did not, however, see the actual shooting because other people were around Candido and Sells. She estimated that six or seven people were blocking her view. Secundino said that Sells, in addition to being good friends with Candido, was "pretty close friends" with Francisco Leal, who (along with Tamayo) was involved in the initial fight with Candido and Javier.

then fell to the ground, and Sells ended up on top of Candido with his hands on Candido. Tamayo said that Rodriguez then came up from behind Sells and pulled him up, that Sells tried to break out of Rodriguez's hold, and that the two men ended up struggling with each other. Tamayo maintained that even before the gun went off, the people in the area started to scatter.

### e. Assessment

There were many instances of persons entering the fray to defend third persons. But because the justification defenses were excluded from the charge, the jury was precluded from determining whether Rodriguez had entered the fight for the same reason.

## 2. Use of Deadly Force

As for whether Rodriguez was justified in using deadly force, the jury heard evidence that the fight was violent. The jurors also heard evidence that the brawl was potentially deadly.

### a. Westbrook

For example, Westbrook said, "[Peters] was hitting the guys that were hitting the girls trying to help the girls up. But, I mean, it was so many people down there, you know -- once he hit one guy, a couple of other guys hit him and stuff like that." Agreeing that he could have easily gotten hurt if he had joined the fight, Westbrook said that he decided to keep his distance and tried to leave.

11

### b. Daisy Leal

Daisy Leal, one of the women involved, was punched in the face during the fight, lost consciousness, and was taken to a hospital.[7] She did not know who punched her. She said that she was terrified during the fight.

### c. Candido

Candido testified that he fell to the ground unconscious and that when he came to, someone was choking him and hitting him in the face. Candido stated that he tried to cover his face, that blood was running down his throat, that he tucked in his head to avoid all the kicks and blows, and that he yelled at Javier to do the same. Because someone was on top of him, Candido explained that he could not breathe and that he feared for his life. After going to a doctor the next day, the doctor treated Candido for a mild concussion for several weeks.[8] Describing his injuries, Candido said that he suffered bruising to his head, nose, eye, left cheek, left shoulder, right arm, and chest. He also continued to experience constant headaches.

---

[7]Daisy Leal would have thus been the fourth person taken to a hospital that night.

[8]Candido was not among those who went to the hospital that night. Candido testified that he was lying face down, that he heard a gunshot, that the weight came off him, and that everyone ran. Candido said that he feared for his life and left the stadium area, ran into a friend who was also fleeing, and caught a ride home. Candido did not know that Rodriguez was involved in the shooting until early in the morning the next day and did not talk with the police until a few days after that.

### d. Jeannette Rodriguez

Javier's wife, Jeannette, who had been pregnant at the time of the brawl, testified that five to six men were beating him and that they had grabbed Javier's gold chain and were pulling him down to the ground with it. Jeannette stated that after Javier removed both his chain and the jersey that he was wearing, she went to fetch them. Someone, though, shoved her and snatched the jersey from her hand. Jeannette testified that she yelled at the men to stop and that she feared Javier, Candido, and Rodriguez would get killed.

### e. Mariela Coronado

Mariela Coronado, who was tailgating "[t]hree tents" away from the disturbance, said that the fight was a terrifying event involving "[a] lot of big men hitting each other hard, kicking each other, yelling." The chaotic and angry event, she related, scared her to death.

### f. Peters

Peters described the fight in this way: "Started out one on one, and then five on five, and it seemed ten on ten." He added, "[T]hey were wrestling around pretty good."

### g. Rodney Webb

Another witness to the fight, Rodney Webb, said, "I see three, four guys on one guy. Then the lady tried to pull him away. The guy swung at her, so she stepped back. They continued to wrestle, fight, or whatever." Webb testified that eventually

only two men were "tussling on the ground," one of which was the person who got shot.

**h. Detective Thomas Sellato**

Detective Thomas Sellato agreed that if someone hit or kicked another person hard enough, the hit or kick could be lethal.

**i. Rodriguez**

Rodriguez testified that he feared for Candido's life and his own life:

Q. Why did you take the risk in relation to your brother in relation to this case?

A. Fear they were going to murder him. I thought they were going to murder me. It takes one guy that big from all these people around. It's chaotic.

Q. Were you doing that to protect yourself and your brother?

A. Yes, sir.

Q. What did you think was going to happen to your brother if you didn't intercede?

A. He was screaming in pain. I thought they were going to kill him.

Q. Around your brother at this time when the gun discharged, how many assailants were around your brother hitting him?

A. Oh, about five.

Q. What did you think was going to happen to you if you didn't intercede?

A. I thought they were going to attack me too and murder me too.

14

Rodriguez later explained why he thought the gun was necessary:

> Q. (BY [DEFENSE COUNSEL]) Did you know it was illegal for you to carry a weapon in public?
>
> A. Yes, sir.
>
> Q. And if it was illegal, why did you get the gun out?
>
> A. I felt it overweighed saving my brothers' lives over that. It was immediately necessary to defend myself and my brothers.
>
> Q. Did you feel the necessity outweighed the danger of carrying a weapon in public?
>
> A. Yes, sir.

Rodriguez acknowledged that he did not see anyone else with a gun, but he added, "[I]t's difficult to determine if anyone else did have a gun." Regarding Sells specifically, Rodriguez commented, "I knew [Sells] owned a pistol."

### j. Assessment

As the Texas Court of Criminal Appeals wrote, "A rational jury could have believed that [Rodriguez] was justified in using deadly force." *Rodriguez*, 629 S.W.3d at 236.

### 3. Intent to Kill

The State used Rodriguez's encounter with Peters to argue that, even before Rodriguez's encounter with Sells, Rodriguez had pointed his gun at someone's head without provocation, had threatened to kill that person, and thereby showed his intent

to kill. The State's argument, though, depended on the credibility of Peters's testimony.

### a. Peters the Bystander

Peters testified that he had seen a female under a pile of fighting men and was debating whether to try pulling her out, but before he had a chance to intervene, Rodriguez pointed a gun at his head, so he left.

### b. Peters the Participant

Peters's version of the events was, however, contradicted. Westbrook said that Peters had jumped into the brawl "to help the girls that were getting their face[s] kicked in and stuff," that "[Peters was] down there fighting the guys that [were] hitting the girls," and that "[Peters] was hitting the guys that were hitting the girls trying to help the girls up." Rodriguez, for his part, described Peters as "in the pile fighting."

### c. Peters the Dissuaded

Westbrook described the sequence of events, including the part about how Rodriguez allowed Peters to leave: "[Rodriguez] gets up from the bottom of the pile and . . . . He gets up, . . . goes into the Hummer driver's side and pulls -- reaches, like grabs a gun, then goes back down." Westbrook later saw Rodriguez pointing a gun at Peters's head. Westbrook said that after Rodriguez let Peters go, Westbrook and Peters started making their way back to their vehicle; in contrast, according to Westbrook, Rodriguez headed into the crowd. "And the next thing you know," Westbrook recounted, "you hear a gun go off."

16

### d. Assessment

A jury could have viewed Rodriguez's encounter with Peters as damning because Rodriguez threatened Peters with a gun. According to Peters, he was only considering joining the fray when Rodriguez pointed a gun at his head.

Rodriguez, however, believed that Peters was one of the assailants. *Id.* at 234. And Westbrook's testimony identifies Peters as one of the participants.

Regardless, what was not disputed was that Rodriguez confronted Peters with a gun and that Peters left. Also undisputed was that Rodriguez did not shoot him.

If Rodriguez entered the fight with the intent to shoot his brothers' attackers, the encounter with Peters belied that intent because Rodriguez identified Peters as one of the attackers. And if Rodriguez entered the fight to save his brothers and used the gun to dissuade any further attacks, the encounter with Peters supported that possibility. Peters left without getting shot. Peters himself testified, "Well, after he held a gun for my head so long, I didn't think he was going to pull the trigger. That was while he had the gun. . . . I didn't think he was going to shoot me."

Obviously, though, Rodriguez's encounter with Sells ended differently.

### 4. Evidence When Framed by the Charge

Rightly or wrongly, the jury could have viewed Rodriguez's testimony as, essentially, "The gun went off accidentally." The State consistently characterized Rodriguez's defense as an accidental shooting. If viewed in that manner, his testimony provided him with no defense at all, because, as stated by the Texas Court of Criminal

17

Appeals, "Even accidental or unintentional movements and actions are voluntary." *Id.*; *see Rogers v. State*, 105 S.W.3d 630, 639 (Tex. Crim. App. 2003) ("[F]or purposes [of the Texas Penal Code], an 'accident' is not the same as, and should not be treated as the equivalent of, the absence of any voluntary act.").

When not viewed as an accident, however, Rodriguez's voluntariness argument potentially had merit under a different iteration of the standard: "Only [1] if an outside force directly causes the movement, or [2] if the movement is the result of truly nonvolitional action such as a muscle spasm, will an action be deemed involuntary." *Rodriguez*, 629 S.W.3d at 234. Rodriguez essentially stated that when jostled, his finger involuntarily contracted on the trigger, which would appear to qualify as a nonvolitional action, the second of the two options.

The Texas Court of Criminal Appeals addressed Rodriguez's voluntariness defense and stated that he "did not testify to an outside force causing the gun to fire." *Id.* This nixed the first option.

As for the second, the court acknowledged its viability:

[Rodriguez] testified that Sells tried to jerk away and other people were pulling on [Rodriguez] while he was pointing the gun at Sells. But he conceded his finger must have been on the trigger when the gun fired, and he testified that he "gripped" the gun "tightly" as part of an "instinctual reaction" to having people grab at him and the gun. A rational jury could find that by gripping the gun tightly with his finger on the trigger, [Rodriguez] fired the gun voluntarily.[9]

[9]Rodriguez said that when someone pulled on his pistol, he instinctively gripped the pistol tightly. He said that if he lost the pistol, he was afraid the other men were going to kill him.

*Id.* In other words, when jostled, Rodriguez might have involuntarily pulled the trigger, or he might have voluntarily pulled the trigger. It was the jury's call.

Once the jury got past the voluntariness issue, the question was not whether Rodriguez was guilty but of which offense he was guilty. The State argued this precise point: "This man right here, he got on the stand in front of you and admitted to all of the charges except whether or not it was intentional or reckless." Along the same lines, the State added, "So what that comes down to is the difference -- is intentionally or knowingly, or recklessly."

Although the charge provided for a "not guilty" verdict, the possibility of a not-guilty verdict was not a particularly strong one, especially if the jury saw Rodriguez's defense as the shooting being accidental, something that the State emphasized was not a defense. Instead, Rodriguez's defense rested on persuading the jury that he fired the gun involuntarily, but under the charge, whether he pulled the trigger voluntarily or involuntarily made no difference. *See* Tex. Penal Code Ann. § 6.04 ("Causation: Conduct and Results"). The difference-maker was his mental state at the time he pulled the trigger. Without the justification defenses, unless Rodriguez's conduct was criminally negligent, the dispute was effectively over whether he committed murder or manslaughter. *See id.* §§ 6.03(d), 19.05(a) ("Criminally Negligent Homicide"). No one disputed that Rodriguez voluntarily introduced the gun into the fight. Nor is there any dispute that Rodriguez's finger was the one on the trigger and

19

that Rodriguez's finger was the one that pulled it. *See Rodriguez*, 629 S.W.3d at 234 ("[Rodriguez] agreed that 'the only way it would have gone off' was if his 'finger was on the trigger.'"). Under the charge, even if Rodriguez pulled the trigger involuntarily, his conduct could still be described as reckless under the circumstances. Rodriguez may have even admitted as much:

> Q. [(BY DEFENSE COUNSEL)] At the moment the gun discharged, were you aware that there was a substantial risk,[10] though, that what you were doing could result in Mr. Sells' death?
>
> A. I understood there was a risk.
>
> Q. You knew about a substantial risk; is that true?
>
> A. Yes.

### 5. Evidence When Framed by the Requested Charge

Had the jury been given instructions on self-defense and defense of a third person, Rodriguez could have acted voluntarily, intentionally, knowingly, or recklessly and still been found not guilty. *See* Tex. Penal Code Ann. §§ 9.31–.33. The charge error deprived the jury of those options and, in the process, did more than comment

---

[10]The Texas Penal Code defines reckless conduct:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(c).

on the weight of the evidence. It effectively resolved critical factual issues definitively against Rodriguez.

## D. Relevant Factors Present in the Record

In addition to the charge, the jury arguments, and the evidence, we also consider and analyze other relevant factors present in the record. Here, voluntariness surfaced during voir dire, and Rodriguez's justification defenses surfaced during both voir dire and opening statements.

### 1. Voir Dire

#### a. The State

##### i. Voluntariness

During voir dire, the State told the jury that an accident is not a legal defense: "And just -- and I'll go over this shortly, but there is no defense in Texas of accident. That is not -- accident is not a legal defense." Later, the State reiterated, "So I mentioned this earlier. Claiming an accident is not a legal defense. Okay. People can't say, oh, it was an accident, so I'm excused from that criminal offense."

##### ii. Self-Defense

In addition to voluntariness, the State addressed self-defense during voir dire:

> So let's talk a little bit about self-defense, which sometimes can pop up in cases where there might have been a struggle or a fight or disagreement, or it may not pop up in a case at all. Remember I told you that we're talking about law that might come up and it might not. And so I need you to know what it is to either recognize it or to say, well, that's not it.

> A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.

The State and the venire members then discussed various aspects of deadly force and self-defense. For example, the State and the venire members engaged in the following dialogue:

> [THE STATE:] Deadly force. Force that is intended or known by the actor to cause or in the manner of its use -- y'all can spell-check me here -- or manner of its use is capable of causing death or serious bodily injury. So when do you get to use deadly force as self-defense?
>
> A person can use deadly force if they are entitled to use force against another in self-defense[.] So going back to that earlier law that we just got through talking about, right? A moment ago? [A]nd the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use of deadly force. So again, what do we have to have here before this kicks in?
>
> (Numerous simultaneous responses)
>
> PROSPECTIVE JUROR: Deadly force from the other side.
>
> [THE STATE]: Someone else using deadly force, right?
>
> PROSPECTIVE JUROR: Or believe that it's --
>
> [THE STATE]: Do you get to take a knife to a fistfight?
>
> PROSPECTIVE JURORS: No.
>
> [THE STATE]: Okay.
>
> PROSPECTIVE JUROR: Depends on how big the guy is.

22

[THE STATE]: Depends on how big the guy is, absolutely, that's a fact, right? But in general, right, we don't say you take a bat or a gun or a knife to a fistfight, right?

PROSPECTIVE JURORS: Right.

The venire members, however, requested clarification:

PROSPECTIVE JUROR: Is that saying -- I could be reading it wrong. But are you saying that someone literally has to have a gun pointed at my face before I can shoot them to feel threatened?

[THE STATE]: What I'm telling you is, is that it says the other's use of deadly force. So there are a variety of things that can constitute deadly force, right? We go back to the definition that we actually do have for that phrase, which is here. Force that is intended or known by the actor to cause or in the manner of its use is capable of causing death or serious bodily injury.

So, again, you're throwing out a very specific fact pattern about does it have to be a gun, a gun in the face. So what I'm telling you is, is that that's how deadly force is defined and that's what's required to be present before another person can be entitled to use deadly force.

. . . .

PROSPECTIVE JUROR: So it's not necessarily required for someone to have a gun or instrument in their hand to be perceived as deadly force.

[THE STATE]: If it fits that definition, if it's force that's intended or known by the actor to cause or in the manner of its use is capable of causing death or serious bodily injury, that's defined as deadly force. So that could be any number of things. Doesn't have to be a gun. Okay. There's all sorts of things that can qualify under that definition as something you can use with deadly force. All right.

23

### iii. Defense of a Third Person and Necessity

The State also discussed defense of a third person and, in the process, the necessity defense. When trying to come up with a hypothetical to illustrate defense of a third person, one of the venire members volunteered, "Well, as a parent, somebody starts assaulting your child." The State responded, "Okay. . . . And you see this happening in front of you and so you believe your intervention is immediately necessary."

### b. Rodriguez

During voir dire, defense counsel addressed self-defense: "[T]he judge will instruct you that when you consider the issue of self-defense, that you must consider it from the viewpoint, all the surrounding facts and circumstances you hear at trial, from the viewpoint of the defendant at that exact time." Defense counsel also discussed justification and justifiable force with venire members at some length. For example, he asked if any of the venire members had used physical force to defend themselves, and one venire person described an incident in high school involving another student; another one said that he had "been jumped a few times" and that on one occasion he got away successfully precisely because his assailants knew that he had a gun in his nearby vehicle. Another venire member described getting arrested for deadly conduct after a stranger, a "[d]rug dealer, pimp, whatever," approached his car in a manner that suggested the stranger was contemplating a robbery, so the venire member displayed his gun and told the stranger to go away: "I asked him to leave, he

would not. He started getting really, you know, in my space, looking at my truck, like, that's when I pull the gun to get away." Afterward, however, the stranger called the police on the venire person and accused the venire person of pointing the gun at him. One venire member was a detective, and he acknowledged having to pull a gun on someone and even, on occasion, having to fire one.

## 2. Opening Statements[11]

During opening statements, defense counsel spoke about defense of a third person:

> [Rodriguez] is oblivious to [the fight taking place]. He hears . . . his brother's call for help. And what would you do? Who amongst us wouldn't run to our brother? He ain't heavy, he's my brother. I'd take a bullet for my brother. So [Rodriguez] runs to the aid of his brother. [Rodriguez], who's minding his own business, runs to the aid of his brother.

Counsel added,

> Now, the State left out in their opening that [Rodriguez] gets -- he gets clobbered. You'll see some pictures of [Rodriguez]. He's got bruises on his head, his hands are bruised up, and he's got blood coming from his nose. This was taken about an hour later after he was taken to the hospital that night.
>
> [Rodriguez] didn't hit himself. [Rodriguez] tried with his fists and his body to stop these men from assaulting his brothers, and he failed. So [Rodriguez] went and got -- oh, yeah, I got that gun, it's up in my car. He runs to get the gun. He runs to get the gun as the law, we'll submit to you, permitted him to do.

---

[11]Although these may look like arguments, defense counsel presented them during his opening statement, so we include them here.

And he comes back to help his brothers. And he finds a slew of people on top of Javier are kicking and hitting him. . . .

. . . .

And you'll learn that [Rodriguez], after he's successful in helping Javier, he sees Candido on the ground, and there's about five men around him, one of which is Mr. Sells.

Candido is on the ground. Men are over him hitting him. [Rodriguez] runs to help him.

When summing up, defense counsel asserted, "The testimony I believe will be that -- that [Rodriguez] acted in self-defense to take that weapon to that Mr. Sells."

### E. State's Arguments

The State argues that the evidence was sufficiently overwhelming to hold that the errors were harmless—essentially that the jury would have found Rodriguez guilty anyway. To support this argument, the State relies on the jury's negative finding on the sudden passion issue during the punishment phase of the trial. We address each contention separately.

#### 1. Finding What the Jury Itself was Prohibited from Finding

The State argues that even if the charge had included the requested justification instructions, the jury would have rejected them, so the errors were harmless. The State's arguments are compelling, but the State should have made them to the jury, not to us.

Put another way, the State argues that despite the fact that the jury was prohibited from making a finding one way or another, we can cure the error by

26

making the finding on the jury's behalf—that is, we can anticipate how the jury would have determined the factual issues based on the evidence and make those findings ourselves. But as an appellate court, we do not possess fact-finding authority; we are limited to unfinding a factual determination that the jury has found or—when given the opportunity—declined to find. *Wilkerson v. State*, 920 S.W.2d 404, 407 (Tex. App.—Houston [1st Dist.] 1996, no pet.); *see Wisdom v. Smith*, 209 S.W.2d 164, 166 (Tex. 1948); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 368 (1960).

## 2. Negative Sudden-Passion Finding

The State argues that the jury's failure to find sudden passion during the punishment phase supports holding the error harmless, citing *Villarreal v. State*, 453 S.W.3d 429, 442 (Tex. Crim. App. 2015), and *Gill v. State*, No. 01-98-00674-CR, 1999 WL 681971, at *2 (Tex. App.—Houston [1st Dist.] Sept. 2, 1999, pet. ref'd) (not designated for publication). We are not persuaded by the State's two authorities.[12]

### a. *Villarreal*

In *Villarreal*, the trial court instructed the jury on self-defense, but the jury rejected it. 453 S.W.3d at 431. *Villarreal* contained unobjected-to charge error, which meant that the defendant had to show egregious harm. *Id.* at 431, 433. The error in

---

[12]An affirmative finding of sudden passion would have changed the offense to a second-degree felony with a punishment range of not more than twenty years or less than two years in prison and a fine not to exceed $10,000. *See* Tex. Penal Code Ann. §§ 12.33, 19.02(d).

*Villarreal* was the trial court's failure to give the instruction on the presumption of reasonableness as to the actor's belief.[13] *Id.* at 431. In that context, the Texas Court of Criminal Appeals relied on the negative sudden-passion finding to hold that the charge error was harmless:

> [B]ecause the jury answered the sudden-passion special issue in the negative, we can infer that the jury did not believe appellant's version of events, and we, therefore, decide that it is exceedingly unlikely that a presumption-of-reasonableness instruction would have had any bearing on the jury's answer as to whether appellant acted in self-defense.

*Id.* at 442. *Villarreal* is distinguishable because in that case, the jury charge, even though defective, asked the jury to consider the defendant's self-defense argument, and the jury rejected it. In contrast, Rodriguez's jury was never asked to consider his justification defenses. Furthermore, our standard of review is not egregious harm but some harm. Finally, *Villarreal* had jury findings on self-defense and sudden passion from which the court gauged whether the harm caused by a collateral charge error was egregious, whereas we have one jury finding (no sudden passion) that provides no insight on what finding the jury might have made if it had been asked whether Rodriguez acted in self-defense.

---

[13]In the State's brief on remand, it argues that Rodriguez would not have been entitled to a presumption of reasonableness as a basis for holding that the charge errors were harmless. *See* Tex. Penal Code Ann. § 9.32(b); *Reyna v. State*, 597 S.W.3d 604, 605–06 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Whether Rodriguez would have been entitled to a presumption of reasonableness is not before us. The trial court mooted that issue when it denied Rodriguez his justification instructions. We decline to give an advisory opinion on that issue.

The negative sudden-passion finding provides no insight because sudden passion requires "adequate cause," which means a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code Ann. § 19.02(a)(1), (d). The justification defenses of self-defense and defense of a third person are perhaps themselves some indicia of "cool refection," that is, Rodriguez was acting with a purpose. The evidence itself further suggested that Rodriguez was still capable of something resembling "cool reflection." For example, when Rodriguez determined that he could not save his brothers with his fists, he retrieved a gun. And when Rodriguez confronted Peters with a gun and Peters agreed to leave, Rodriguez did not shoot him. Whether Rodriguez acted with sudden passion during his encounter with Sells is yet another issue. Regardless, we decline to use the jury's negative sudden-passion finding as a surrogate for a rejection of Rodriguez's justification defenses.

### b. *Gill*

In *Gill*, another case that the State relies on, the defendant attacked the sufficiency of the evidence supporting the jury's failure to find both self-defense and, later at the punishment trial, sudden passion. 1999 WL 681971, at *1. The court held that the evidence supported both findings. *Id.* at *2. *Gill* did not involve a harmless-error analysis and is thus distinguishable. And in *Gill*, unlike here, the jury was allowed to consider the defendant's claim of self-defense and rejected it. *Id.* at *2.

### 3. Summary

Rodriguez testified to facts that, if believed, would have supported his defensive claims. Admittedly, other witnesses testified to other sets of facts that, if believed, supported convicting Rodriguez of murder[14] or, possibly, manslaughter. What to believe was the jury's prerogative. *Rodriguez*, 629 S.W.3d at 231 ("Credibility is for the jury to decide . . . ."). As an appellate court, we will not weigh in on fact-specific determinations, as those are a function reserved for properly instructed juries. *Reeves*, 420 S.W.3d at 820. We decline to hold that the State proved its case so overwhelmingly on both the guilt and the justification issues that the error was harmless. *See id.*; *Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018) (providing that the State must present enough evidence for a jury to (1) find the essential elements of the offense beyond a reasonable doubt and (2) reject the defendant's self-defense issue beyond a reasonable doubt).

### F. Some Harm

We hold that Rodriguez suffered some harm. *See Rogers v. State*, 550 S.W.3d 190, 192 (Tex. Crim. App. 2018) ("Failure to instruct on a confession-and-avoidance defense is rarely harmless . . . ."); *Dugar v. State*, 464 S.W.3d 811, 821–22 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) ("Appellant pitched this case as a question of self-defense . . . . When that instruction was taken away from the jury, appellant was

---

[14]Webb (one of the nonparticipating witnesses to the fight), for example, said that Rodriguez put the gun to Sells's head and "just pow." Another tailgater, Anthony Aguirre, testified that Rodriguez shot Sells while Sells was trying to get to his feet.

left without his only defensive theory, making his conviction a virtual inevitability."); *Guilbeau v. State*, 193 S.W.3d 156, 161 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that where entire defense rested on defendant's right to defend himself from person he admitted killing, error in denying requested charge on self-defense harmed defendant).

We express no opinion on how the various factual issues should be ultimately resolved. We hold only that Rodriguez suffered some harm because the charge did not include instructions on self-defense and defense of a third person.

## IV. Conclusion

Having held that Rodriguez suffered some harm, we reverse the trial court's judgment and remand the case to the trial court for a new trial.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: July 21, 2022

31